625 F.2d 1150
 Carolyn RUSH (Pseudonym), Plaintiff-Appellee,
v.
T. M. "Jim" PARHAM, etc., et al., Defendants,
David Poythress, Commissioner, Georgia Department of Medical
Assistance, and Patricia Roberts Harris,
Secretary, Department of Health and
Human Services, Defendants-Appellants.
 No. 77-2743.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 15, 1980.
 
 Michael J. Bowers, Senior Asst. Atty. Gen., Jefferson James Davis, Staff Asst. Atty. Gen., Atlanta, Ga., Stephanie B. Manis, Asst. Atty. Gen., for Poythress.
 William L. Harper, U. S. Atty., Stephen P. Georgeson, Asst. Regional Atty., Dept. of H.H.S., Atlanta, Ga., Linda M. Cole, Eloise E. Davies, Alice Daniel, Asst. Attys. Gen., Civil Div., Appellate Section, Dept. of Justice, Washington, D. C., for Harris.
 Kenneth G. Levin, Atlanta Legal Aid Society, Inc., Atlanta, Ga., for plaintiff-appellee.
 Sara Rosenbaum, National Health Law Program, Inc., Santa Monica, Cal., for amicus curiae Grey Panthers.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before BROWN, TJOFLAT and GARZA, Circuit Judges.
 TJOFLAT, Circuit Judge:
 
 
 1
 Carolyn Rush sued various federal and Georgia officials to secure Medicaid funding for transsexual surgery. The district court, on Rush's motion for summary judgment, ordered state defendants to pay for the surgery, holding that a state Medicaid program cannot, consistent with 42 U.S.C. § 1396 (1976), categorically deny funding for necessary medical services. The district court, also ordered federal defendants to disapprove that portion of Georgia's Medicaid plan that "irrebuttably den(ies) Medicaid coverage for transsexual surgery." Rush v. Putnam, 440 F.Supp. 383 (N.D. Ga. 1977).
 
 
 2
 We disagree with the district court's disposition of the case, and hold that state defendants should have been permitted to show at trial that (1) the Georgia Department of Medical Assistance[1] has a ban against making payment for experimental treatment because such treatment is not medically necessary, and that transsexual surgery is experimental; or (2) the Department of Medical Assistance provides for transsexual surgery in an appropriate case, but properly determined that it was medically inappropriate in plaintiff's case. As to the federal defendants, we find that the district court should have dismissed for lack of jurisdiction. Accordingly, we reverse and remand.
 
 
 3
 * Background
 
 
 4
 The history to this case begins in 1974, when Rush, an anatomical male who had been diagnosed as a transsexual, sought approval from the Department of Medical Assistance for Medicaid funding of transsexual surgery, which had been the medical recommendation of her[2] physician. Since Rush was a recipient of Supplemental Security Assistance, she qualified for benefits under Georgia's Medicaid program. Payment was at first approved, but before the operation could be scheduled, the approval was rescinded. According to state defendants, the reason for the retraction was that transsexual surgery was experimental, and, in any event, inappropriate treatment for Rush.
 
 
 5
 Rush requested reconsideration of the denial, and in support of the necessity of surgery, submitted affidavits from two medical specialists in the treatment of transsexuals. The thrust of each was that plaintiff was a "true transsexual," i. e., an anatomical male with a female gender identity, and that the only effective means of treatment was surgical change of Rush's anatomical sex.
 
 
 6
 The Department of Medical Assistance, however, again rejected Rush's claim for essentially the same reasons as before. The only significant difference between the two decisions was that since the original rejection, the Department had amended the Medicaid plan explicitly to exclude "experimental surgery, e. g., transsexual surgery," see Record at 458, from coverage, and this was noted as a specific ground for the denial.
 
 
 7
 Rush brought suit in district court, naming as defendants state officials responsible for administering Georgia's Medicaid plan, and federal officials responsible for administering Medicaid nationally and in the region including Georgia. The gist of the complaint was that Georgia's refusal to pay for plaintiff's transsexual surgery violates a federal statutory requirement that a state Medicaid program pay for all medically necessary services,[3] and violates the equal protection clause of the fourteenth amendment by discriminating between transsexuals and other Medicaid participants requiring surgery. Rush's requested relief was that the court (1) declare Georgia's ban against paying for transsexual surgery illegal and enjoin state defendants from enforcing the ban; (2) order state defendants to pay for plaintiff's surgery; and (3) issue a writ of mandamus requiring federal defendants to withdraw approval of Georgia's current Medicaid plan.[4]
 
 
 8
 After limited discovery, Rush moved for summary judgment, arguing that there were only two issues before the court, neither of which involved a disputed issue of material fact. The first issue was whether a state Medicaid program could categorically deny funding of a medically necessary service. According to Rush, the factual question whether transsexual surgery was medically necessary had been foreclosed by her submission of affidavits by two physicians stating that transsexual surgery was medically necessary (although defendants had submitted counter affidavits stating that transsexual surgery was ineffective and dangerous). The second issue was whether the Department of Medical Assistance abused its discretion in finding that the surgery was not indicated for Rush.
 
 
 9
 Defendants opposed the motion for summary judgment, arguing that a state Medicaid plan can exclude medically necessary treatment as long as the exclusion is reasonable. But even if the court were to agree with Rush that any medically necessary service must be paid for, the factual issue of the medical necessity of transsexual surgery could not be disposed of on Rush's motion.
 
 
 10
 The district court granted the motion, holding (1) that Georgia's Medicaid program must pay for all medically necessary services of Medicaid recipients; and (2) that the determination of plaintiff's physician that transsexual surgery was medically necessary "could suffer no interference from the state." The only modification to Rush's proposed relief was that the federal defendants were ordered to disapprove only those portions of the plan that denied funding for transsexual surgery. This appeal is taken from the summary judgment entered pursuant to the district court's order.
 
 II
 Federal Defendants
 
 11
 Rush's complaint against the federal defendants seeks relief under 28 U.S.C. § 1361 (1976), which vests district courts with mandamus jurisdiction over officers and employees of the United States. Since Rush alleges no plausible basis for jurisdiction (and indeed, requests no relief) of federal defendants other than mandamus, "(t)he determinative issue . . . is whether under general principles of law mandamus provides an appropriate means for obtaining the relief prayed for in this case." Carter v. Seamans, 411 F.2d 767, 773 (5th Cir. 1969), cert. denied, 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970). If it does not, we must dismiss the action against the federal defendants for lack of jurisdiction.
 
 
 12
 Mandamus relief under section 1361 is available only when (1) "defendant official or agency owes a specific duty to the plaintiff," Kirkland Masonry, Inc. v. Commissioner, 614 F.2d 532, 534 (5th Cir. 1980); and (2) plaintiff has no other adequate remedy available to him. Carter v. Seamans, supra. Putting aside the question whether any federal defendant owes a specific duty to this plaintiff,[5] we think it clear that mandamus is unavailable here because Rush's remedy against Georgia state defendants is adequate to provide her every significant aspect of the relief requested. Ramirez v. Weinberger, 363 F.Supp. 105 (N.D.Ill.1973), aff'd 415 U.S. 970, 94 S.Ct. 1553, 39 L.Ed.2d 867 (1974) (mandamus to compel Secretary of HEW to withhold funding from allegedly unconstitutional state AFDC program unavailable since action against state defendants to correct program is adequate remedy). Thus, this action cannot be premised on section 1361, and, finding no other jurisdictional basis for the relief requested, we dismiss the action against the federal defendants.
 
 III
 State Defendants
 
 13
 The district court held that under the federal Medicaid statute, a state program is required to pay for any services a physician determines to be medically necessary for the patient.[6] Since Rush's physician prescribed transsexual surgery, it apparently followed that Georgia's Medicaid program was obligated to pay for the surgery, and the district court so ordered. We disagree with the district court, and hold instead that a state may adopt a definition of medical necessity that places reasonable limits on a physician's discretion. One such limitation is the one Georgia contends it used in denying the surgery: a ban against reimbursement for experimental forms of treatment,[7] i. e., treatment not generally recognized as effective by the medical profession.[8]
 
 
 14
 We also hold that a state Medicaid agency can review the medical necessity of treatment prescribed by a doctor on a case-by-case basis. Our conclusions are more fully discussed below.
 
 A.
 
 15
 The district court's holding that a state must pay for all treatment found by a doctor to be medically necessary comprises two separate conclusions: first, that a state Medicaid program must provide all medically necessary services; and second, that the private physician is the sole arbiter of medical necessity. We find it unnecessary to determine the correctness of the first conclusion, for the grounds on which the state seeks to justify its refusal to pay for the surgery, i. e., that it was experimental and not indicated for this plaintiff, are fully consonant with a requirement that all medically necessary services be funded.[9] We proceed then, to consideration of the second component of the district court's holding.
 
 
 16
 The district court has, in effect, held that a state has no role in determining whether a particular service is medically necessary. In our view, however, the Medicaid statutes and regulations permit a state to define medical necessity in a way tailored to the requirements of its own Medicaid program. Our analysis begins with the statute, which provides that:
 
 
 17
 A State plan for medical assistance must . . . include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which . . . are consistent with the objectives of this (Title).
 
 
 18
 42 U.S.C. § 1396a(a)(17) (1976). The Supreme Court has interpreted this language as conferring "broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be 'reasonable' and 'consistent with the objectives' of the Act." Beal v. Doe, 432 U.S. 438, 444, 97 S.Ct. 2366, 2371, 53 L.Ed.2d 464 (1977). Under the district court's decision, however, the states would only have discretion to exclude from coverage the so-called optional services listed in sections 1396d(a)(6)-(17). The general language of section 1396a(a) suggests that Congress intended the states' discretion to be considerably less circumscribed.
 
 
 19
 The key to defining the states' role in determining the extent of coverage can be found in the Supreme Court's use of the word "standard" in the passage we quoted from Beal v. Doe. We think the Court was saying that a state may establish standards for individual physicians to use in determining what services are appropriate in a particular case. This state responsibility to establish standards extends at least to the shaping of a reasonable definition of medical necessity. The Department of Health and Welfare regulations so provide: "The (state) agency may place appropriate limits on services based on such criteria as medical necessity. . . ." 42 C.F.R. § 440.230(c)(2).
 
 
 20
 This does not remove from the private physician the primary responsibility of determining what treatment should be made available to his patients. We hold only that the physician is required to operate within such reasonable limitations as the state may impose. This same relationship between the private physician and government exists in the federal Medicare program,[10] which, like Medicaid, is centered around the judgment of the private physician. See 42 U.S.C. § 1396a(a)(23) (1976) (Medicaid recipients permitted freedom of choice in selecting a physician) and 42 U.S.C. § 1395a (1976) (similar Medicare provision).
 
 
 21
 The next question is whether Georgia's definition of medically necessary services can reasonably exclude experimental treatment. We think that it can, and find support for our conclusion by anology to the way the federal Medicare laws have been interpreted.
 
 
 22
 The statute creating Medicare, unlike that creating the Medicaid program, sets out specific statutory limitations on what types of care are to be provided. One such limitation excludes payment for medical services "which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member," 42 U.S.C. § 1395y(a) (1) (1976), which is simply the negative formulation of the district court's conclusion that all medically necessary services are to be provided. The Medicare administration reads this limitation as foreclosing reimbursement for experimental treatment.[11] See Medicare Intermediary Letters Nos. 77-4 & 77-5, (1976 Transfer Binder) Medicare & Medicaid Guide (CCH) P 28,152 (1976). Moreover, the limitation has been used to prohibit payment for particular types of services. See, e. g., Medicare Hospital Manual, Medicare & Medicaid Guide (CCH) P 27,201 ("procedure (biofeedback) is experimental and, therefore, cannot be considered to be reasonable and necessary for diagnosis and treatment").
 
 
 23
 Thus, the administrators of Medicare agree with defendants' contention that experimental forms of treatment are medically unnecessary. On this appeal, our inquiry is limited to whether such an interpretation of medical necessity would be a valid exercise of Georgia's discretion to set standards under the Medicaid statute. Because we see little merit to the contention that medically necessary services must be defined to include experimental treatment, with all its attendant risks to the recipient population, we find that it would be. Thus, we must remand to the district court to determine (1) whether Georgia, in fact, had a policy prohibiting payment for experimental services when it first rejected plaintiff's application;[12] and, if it did, (2) whether its determination that transsexual surgery is experimental is reasonable.[13]
 
 B.
 
 24
 If on remand, the district court finds that the state defendants' decision to deny payment for Rush's surgery was not based on a prohibition against reimbursement for experimental treatment, or if it finds that transsexual surgery was not experimental, it must consider defendants' second contention: that they reached a proper administrative determination that transsexual surgery was inappropriate treatment for Rush. We have reviewed the record, and are unable to say whether defendants engaged in such a determination, and if they did, what standard of review they used to consider Rush's physician's contrary opinion. These are material questions of fact that should not have been resolved by the district court on a motion for summary judgment. Keiser v. Coliseum Properties, Inc., 614 F.2d 406 (5th Cir. 1980).
 
 
 25
 We note that the proper standard for defendants to use in reviewing the doctor's determination depends on whether Georgia had a policy of limiting payment for experimental surgery to exceptional cases (and if it did, whether transsexual surgery was experimental).[14] If Georgia had such a policy and defendants were simply deciding whether Rush's case presented exceptional circumstances, defendant's determination should be sustained unless Rush was able to show compelling reasons why an exception should be made for her. To show such reasons, we think Rush was required to present convincing evidence that no other form of treatment would improve her condition, and that transsexual surgery was unlikely to worsen it.
 
 
 26
 If the district court finds that Georgia did not have a policy limiting payment for experimental surgery to exceptional cases (or that transsexual surgery was not experimental), the only permissible review of the physician's opinion would have been such "as may be necessary to safeguard against unnecessary utilization of . . . care and services . . .." 42 U.S.C. § 1396a(a)(30) (1976). On a review so limited, the overriding consideration is that under Medicaid, "(t)he physician is to be the key figure in determining utilization of health services." S.Rep. No. 404, 89th Cong., 1st Sess., 46, Reprinted in [1965] U.S.Code Cong. & Admin.News pp. 1943, 1986. See also, Beal v. Doe, supra. Under these circumstances, we think defendants would have been limited to determining whether the physician's diagnosis, or his opinion that the prescribed treatment was appropriate to the diagnosis, was without any basis in fact.
 
 C.
 
 27
 In reaching our decision, we were aware of several cases in which courts ordered state Medicaid programs to pay for transsexual surgery. See, e. g., Pinneke v. Preisser, 623 F.2d 546, (8th Cir. 1980); Doe v. Minnesota Department of Public Welfare, 257 N.W.2d 816 (Minn.1977). But see, e. g., Denise R. v. Lavine, 39 N.Y.2d 279, 347 N.E.2d 893, 383 N.Y.S.2d 568 (1976). We do not read these cases as deciding the issue whether a state may define medical necessity to exclude experimental surgery. Nor do we think these cases would foreclose state review of whether a doctor's diagnosis and recommendation of treatment for a particular patient are in error. To the extent these cases do hold that a state must pay for any treatment a doctor finds to be medically necessary, thus eliminating the issues that we have found unripe for summary disposition, we disagree for the reasons given in the body of this opinion.
 
 
 28
 REVERSED and REMANDED.
 
 
 
 [1]
 At the time this lawsuit was brought, Georgia's Medicaid program was a division of the Department of Human Resources. In this opinion, we refer to the Medicaid Division by the name of its successor agency, the Department of Medical Assistance
 
 
 [2]
 In the medical literature, feminine pronouns are used to describe a transsexual with a male biological gender. We adopt the use of this convention for this opinion
 
 
 [3]
 As used herein, the term "medically necessary services" extends only to the five categories of service that the Medicaid statute requires a state to provide. 42 U.S.C. § 1396a(a)(13)(B). These services are: (1) inpatient hospital services; (2) outpatient hospital services; (3) other laboratory and x-ray services; (4) skilled nursing facilities, periodic screening and diagnosis and family planning services; and (5) physician's services. 42 U.S.C. § 1396d(a)(1)-(5) (1976). It does not include those services designated by the statute as optional, e. g., home health care services, private duty nursing, physical therapy, etc., even though such services may be medically necessary. 42 U.S.C. § 1396d(a)(6)-(17)
 
 
 [4]
 Plaintiff premised jurisdiction on 28 U.S.C. § 1343 (1976) (conspiracy to deprive plaintiff of civil rights under color of state law) and concepts of pendant jurisdiction. In addition, plaintiff alleged mandamus jurisdiction against the federal defendants under 28 U.S.C. § 1361 (1976)
 
 
 [5]
 Were we to reach the issue, we would be hesitant to find that federal officials owe a duty to particular Medicaid recipients to disapprove a state Medicaid plan that improperly denies them benefits. We have been pointed to no statutory language explicitly creating such a duty, and to find one implicit in the overall Medicaid scheme would likely alter the general supervisory responsibilities of the federal government therein
 
 
 [6]
 The district court would recognize one exception to this rule: where, on a utilization review, the state Medicaid program determined that the prescribed medical treatment was based on an incorrect diagnosis, the program need not make reimbursement
 
 
 [7]
 It is unclear from the record, but Georgia's position may be that it will make payment for experimental surgery in an exceptional case. Since we find that Georgia can permissibly prohibit payment for all experimental treatment, we would also find that it can adopt a qualified prohibition recognizing special circumstances. This is discussed in Part B infra
 
 
 [8]
 A detailed definition of experimental surgery is included in fn. 11, infra
 
 
 [9]
 The basis for finding that a state program must pay for all medically necessary services is that the appropriation section of the Medicaid statute states that the purpose of the Medicaid program is to enable each state
 (T)o furnish . . . medical assistance on behalf of (certain) families . . . and . . . individuals, whose income and resources are insufficient to meet the cost of necessary medical services.
 42 U.S.C. § 1396 (emphasis added). The district court reads this section as a substantive provision requiring state programs to provide all medically necessary services to the Medicaid population. This view has found support in several recent court decisions and the Supreme Court has twice indicated in dicta that "serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage." Beal v. Doe, 432 U.S. 438, 444; 97 S.Ct. 2366, 2371, 53 L.Ed.2d 464; Harris v. McRae, --- U.S. ----, ---- n.11, 100 S.Ct. 2671, 2683 n.11, 65 L.Ed.2d --- (1980). Other courts, however, have held that the quoted statutory language only identifies the group that is to be served by Medicaid, and was not intended to specify the extent of coverage. Preterm Inc. v. Dukakis, 591 F.2d 121 (1st Cir. 1979). Thus, it has been held that a state can limit medically necessary hospital treatment to 21 days in order to conserve Medicaid funds. Virginia Hospital Association v. Kenley, 427 F.Supp. 781 (E.D.Va.1977). It may be that a state Medicaid plan can limit coverage of medically necessary services, but only if the limitation is necessary to a state interest that is permissible under the Medicaid statutory scheme, which may have been the situation in the Virginia Hospital case.
 
 
 [10]
 Medicare is administered directly by the federal government on a national rather than statewide basis
 
 
 [11]
 The clearest articulation of the considerations that go into determining whether a particular service is experimental is found in a letter Medicare uses to explain to its clients and providers why a service is ineligible for reimbursement:
 In making such a decision (whether to provide payment for a particular service), a basic consideration is whether the service has come to be generally accepted by the professional medical community as an effective and proven treatment for the condition for which it is being used. If it is, Medicare may make payment. On the other hand, if the service or treatment is not yet generally accepted, is rarely used, novel or relatively unknown, then authoritative evidence must be obtained that it is safe and effective before Medicaid may make payment.
 Enclosure # 2 to Intermediary Letters Nos. 77-4 & 77-5, (1976 Transfer Binder) Medicare & Medicaid Guide (CCH) P 28,152 (1976).
 
 
 [12]
 Georgia did not adopt a written prohibition against reimbursement for experimental services until after it had rejected plaintiff's first application. Georgia may, however, have had an administratively evolving policy against making such payments at the time of the initial denial. It is also possible that Georgia's adoption of an express policy prohibiting payment for experimental surgery could be applied retroactively to plaintiff's request. Cf. General Telephone Co. of the Southwest v. United States, 449 F.2d 846 (5th Cir. 1971). We caution, however, that if defendants simply denied payment for the proposed surgery because it was transsexual surgery, Georgia should now be required to pay for the operation, since a "state may not arbitrarily deny or reduce the amount, duration, or scope of a required service . . . solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c)(1), as corrected by 43 Fed.Reg. 57253 (Dec. 7, 1978)
 
 
 [13]
 We think it a simple matter of logic that the district court's determination should be based on current medical opinion, regardless of the prevailing knowledge at the time of plaintiff's application
 
 
 [14]
 As indicated in fn. 11, supra, we are unable to tell from the record whether defendants' position that Georgia had an absolute ban against paying for experimental surgery or only a qualified prohibition of the sort described in the text