**Carolyn RUSH, Plaintiff,**

v.

**Aaron JOHNSON, Director, Georgia Department of Medical Assistance, Defendant.**

**Civ. A. No. C76–1445A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

June 9, 1983.

Kenneth G. Levin, of Atlanta Legal Aid Society, Atlanta, Ga., for plaintiff.

Jefferson J. Davis and Stephanie Manis, Asst. Attys. Gen., State of Ga., Atlanta, Ga., for defendant.

## ORDER

RICHARD C. FREEMAN, District Judge.

This is an action for declaratory, injunctive and mandamus relief and damages instituted by plaintiff Carolyn Rush,[1] an individual eligible for Medicaid coverage under 42 U.S.C. § 1396 et seq. (hereinafter "Title XIX" or "Medicaid") against the Director[2] of the Georgia Department of Medical Assistance (hereinafter "State"),[3] who denied the plaintiff's application for Medicaid reimbursement of proposed transsexual surgery expenses for inpatient hospital and physician's services. The jurisdiction of this court is invoked pursuant to 28 U.S.C. §§ 1343 and 1361.

By order dated August 2, 1977, the court granted the plaintiff's motion for summary judgment and ordered the State to pay for the surgery, holding that a state Medicaid program cannot, consistent with 42 U.S.C. § 1396, categorically deny funding for necessary medical services. On September 15, 1980, the United States Court of Appeals for the Fifth Circuit reversed the court's decision and remanded the case to this court to determine:

(1) whether Georgia, in fact, had a policy prohibiting payment for experimental services when it first rejected plaintiff's application; and if it did (2) whether its determination that transsexual surgery is experimental is reasonable.

*Rush v. Parham*, 625 F.2d 1150, 1157 (5th Cir.1980).[4] The Fifth Circuit further directed that if the court finds that the State's

---

1. "Carolyn Rush" is a pseudonym permitted by the court to maintain the anonymity and confidentiality of the plaintiff.

2. The complaint named as defendant Sam Thurmond, in his official capacity as Commissioner of Medicaid Services. He was succeeded in office by David Poythress, who has since been succeeded by Aaron Johnson. Substitution of parties who are public officers named in their official capacity is nearly automatic and proceeds here by order of this court. *See* Rule 25(d)(1), Fed.R.Civ.P.; C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1960, at 676.

3. At the time this lawsuit was brought, Georgia's Medicaid program was a division of the Department of Human Resources. In this order, the court refers to the Medicaid Division by the name of its successor agency, the Department of Medical Assistance.

4. In footnotes, the Fifth Circuit explained,

Georgia did not adopt a written prohibition against reimbursement for experimental services until after it had rejected plaintiff's first application. Georgia may, however, have had an administratively evolving policy against making such payments at the time of the initial denial. It is also possible that Georgia's adoption of an express policy prohibiting payment for experimental surgery could be applied retroactively to plaintiff's request. *Cf. General Telephone Co. of the Southwest v. United States,* 449 F.2d 846 (5th Cir.1971). We caution, however, that if defendants simply denied payment for the proposed surgery because it was transsexual surgery, Georgia should now be required to pay for the operation, since a "state may not arbitrarily deny or reduce the amount, duration, or scope of a required service ... solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c)(1), as corrected by 43 Fed.Reg. 57253 (Dec. 7, 1978).

*Rush v. Parham*, 625 F.2d at 1157, n. 12.

The court continued to explain:

We think it a simple matter of logic that the district court's determination should be based on current medical opinion, regardless of the prevailing knowledge at the time of plaintiff's application.

*Rush v. Parham*, 625 F.2d at 1150 n. 13.

decision to deny payment for the plaintiff's surgery was not based on a prohibition against reimbursement for experimental treatment,[5] or if it finds that transsexual surgery is not experimental, the court must consider the State's contention that they reached a proper administrative determination that transsexual surgery was inappropriate treatment for Rush.[6]  *Id.*

Having held a trial and upon careful consideration of the parties' proposed findings of fact and conclusions of law and supporting memoranda, the court makes the following findings of fact and conclusions of law.  *See* Rule 52(a), Fed.R.Civ.P.

## I.  FINDINGS OF FACT

### A.  Whether the State had a Policy

In early 1974, plaintiff Rush applied to the Medicaid program of the Georgia Department of Medical Assistance for payment of the cost of transsexual surgery. At that time, the Georgia Medicaid program contained: (1) a written policy prohibiting payment for "[s]ervices which are not reasonable and necessary for the diag-

nosis or the treatment of an illness or injury;"[7] (2) a written policy prohibiting payment for "[c]osmetic surgery, except when furnished in connection with prompt repair of accidental injury or for the improvement of function in a malformed body member;"[8] (3) a written policy providing that "[t]he diagnostic justification of the claimed services, as well as the customary methods of handling similar cases by the individual practitioner, are also reviewed;"[9] (4) a written policy providing that "[p]rior authorization is used to determine medical necessity, to consider alternate methods of care, and to curb over-utilization;"[10] and (5) a written policy requiring prior authorization for certain out-of-state services.[11]  Prior to May 1975, the program contained no express prohibition concerning the funding of experimental surgery.[12]  In May 1975, the Department adopted an express written policy prohibiting payment for "[e]xperimental surgery, e.g. transsexual operations."[13]  This policy was included in the Georgia State Medicaid Plan which was submitted to the United States Department of Health, Education, and Welfare for ap-

**5.**  The Fifth Circuit defines "experimental services" by reference to a letter that the Medicare program uses to explain to its clients and providers why a service is ineligible for reimbursement.  *Rush v. Parham,* 625 F.2d at 1156 n. 11.

**6.**  The Fifth Circuit observed that:

We note that the proper standard for defendants to use in reviewing the doctor's determination depends on whether Georgia had a policy of limiting payment for experimental surgery to exceptional cases (and if it did, whether transsexual surgery was experimental).  If Georgia had such a policy and defendants were simply deciding whether Rush's case presented exceptional circumstances, defendant's determination should be sustained unless Rush was able to show compelling reasons why an exception should be made for her.  To show such reasons, we think Rush was required to present convincing evidence that no other form of treatment would improve her condition, and that transsexual surgery was unlikely to worsen it.

If the district court finds that Georgia did not have a policy limiting payment for experimental surgery to exceptional cases (or that transsexual surgery was not experimental), the only permissible review of the physician's opinion would have been such "as may be necessary to safeguard against unnecessary

utilization of . . . care and services. . . ."  42 U.S.C. § 1396a(a)(30) (1976).  On a review so limited, the overriding consideration is that under Medicaid, "[t]he physician is to be the key figure in determining utilization of health services."  S.Rep. No. 404, 89th Cong., 1st Sess., 46, *reprinted in* [1965] U.S.Code Cong. & Admin.News, pp. 1943, 1986.  *See also, Beal v. Doe,* 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977) *supra.*  Under these circumstances, we think defendants would have been limited to determining whether the physician's diagnosis, or his opinion that the prescribed treatment was appropriate to the diagnosis, was without any basis in fact.  *Rush v. Parham,* 625 F.2d at 1157.

**7.**  Defendant's Exh. H.

**8.**  *Id.*

**9.**  *Id.*

**10.**  Defendant's Exh. G.

**11.**  Defendant's Exh. A.

**12.**  Stipulation of Parties, ¶ 1.

**13.**  Defendant's Exh. N.

proval on September 18, 1975. That Plan was approved on December 30, 1975, retroactive to August 1, 1975.

Rush's application for payment of the cost of transsexual surgery was reviewed by Ms. Cathy Harbin, who processed Medicaid claims for out-of-state services. At the time it was filed, Rush's application contained the opinion of her physician, Dr. Lee Shelton, who stated firmly that the plaintiff "is female functionally and physically and is handicapped severely by having no suitable arifice [sic] for sexual intercourse with a male." [14] Dr. Shelton recommended surgery for the creation of a vagina and modification of existing genitalia.

In reviewing Rush's application, Ms. Harbin sought additional information about transsexualism from the Vocational Rehabilitation Agency of the state of Georgia, two local libraries, a state employee who was a transsexual, various gender identity clinics, and Ms. Harbin's personal physicians. Upon consideration of this information, Ms. Harbin concluded that Rush's application should be approved.[15] She made this recommendation to Mr. Al Villines, the Director of the Department. He agreed with Ms. Harbin's recommendation and approved Rush's application for payment of the cost of transsexual surgery to be performed out-of-state.[16]

Subsequently, in late 1974, Rush's treating physician requested a guarantee of payment for Rush's surgery prior to its performance. This request came to the attention of Mr. Jack Moore, the Chief of the Medicaid Section, who advised Rush's physician that the program could not guarantee payment. Mr. Moore then brought this request to the attention of Mr. Sam Thurmond, who had replaced Mr. Villines in 1974 as the Director of the Department. Mr. Thurmond reviewed Rush's file. He testi-

fied that "a host of red flags were raised:" the file did not indicate whether an independent medical evaluation had been completed, whether the surgery was then being performed in Georgia, or whether the local medical schools had an opinion about this type of surgery. To remedy these inadequacies, Mr. Thurmond directed Mr. Moore to supplement the file with further information.

In November 1974, Dr. Dewitt C. Alfred, Jr., Associate Professor of Psychiatry, Emory University School of Medicine, Atlanta, Georgia, evaluated the plaintiff. While he found no evidence of organic brain syndrome or mental deficiency, he noted evidence of a psychiatric condition known as "Male Sex Role Inversion," which is "characterized by desire for Transsexualism and Psychoneurotic Traits (tendency toward Depression dominating) and Character Neurotic Traits (manipulative patterns dominating)." Defendant's Exh. J. Dr. Alfred related that he had no knowledge of a particular surgeon or surgical group that was performing transsexual surgery in Georgia. He then stated:

Because of the presence of significant evidence of unconscious *Ambivalence* in the patient toward Transsexual Surgery, I cannot state an unqualified approval of such surgery for this patient, in spite of the overt and consciously expressed wish to have the surgery. It is necessary however to take the following authoritative quote into consideration: "So far as is known, there is not a single case of clearly established adult inversion that has been cured by psychotherapy or any other form of treatment .... The fact that the transsexualist-invert belongs biologically to one sex but psychologically to the other sex commonly creates a deep root-

14. Plaintiff's Exh. 3.

15. Ms. Harbin testified that her research revealed that before transsexual surgery would be performed by a physician, a three-day psychiatric evaluation of the patient would be conducted by the treating physician to determine whether the patient was an appropriate candidate for transsexual surgery. Ms. Harbin be-

lieved that this evaluation was a condition precedent to surgery.

16. Mr. Villines' approval was noted in longhand on the report submitted to the Department by Dr. Shelton. Mr. Villines wrote: "Approval on basis of rehabilitation potential after surgery." Plaintiff's Exh. 4.

ed, underlying pattern of mal-adjustment among such individuals. A healthy integration of the personality is hardly possible in such cases. Some authorities are of the opinion, however, that these individuals do improve in their adjustment to life after they have undergone the 'change-over' operative procedure." (From: The Encyclopedia of Sexual Behavior: Ellis and Abarbanel (Ed.), Hawthorn Books, Inc., New York, 1964, Volume II, "Sex Role Inversion," pages 1020 and 1021.) *Id.* On the basis of this authoritative opinion, Dr. Alfred recommended that Rush be referred to an out-of-state surgical group who would make the final decision as to whether surgery should be performed on Rush.

In January 1975, Mr. Moore wrote to the Georgia Medical Care Foundation[17] seeking its view "as to whether [transsexual] surgery is the appropriate treatment for [the plaintiff's] condition and if this procedure has been established as an accepted method of treatment." Plaintiff's Exh. 10. One month later, on February 26, 1975, Dr. Earnest C. Atkins, Secretary of the Foundation, replied:

> After considerable discussion, the Peer Review Panel expressed the opinion that in some instances this type of operation has been of major assistance in improving the functioning capacity of individuals. It should be noted that the experience of the collected Panel members with this type of approach is minimal, limited to some three or four cases with varying degrees of involvement. The Panel does not feel qualified to express an opinion regarding whether or not this should come under the province of the Medicaid Program. The Panel assumes that in any event, the suitability of the patient for this particular approach will be the decision of the immediate therapist or the team that will undertake the procedure if indeed it is subsequently approved.

Plaintiff's Exh. 11. After receiving this letter, Mr. Moore submitted it to Dr. E.J. Gillespie, Medicaid's Medical Consultant. Mr. Moore told Dr. Gillespie that he found the Foundation's letter to be non-definitive. Dr. Gillespie reached the same conclusion concerning the Foundation's letter and suggested that Rush's file be sent for further review to Dr. Skelton, Director, Division of Mental Health. Plaintiff's Exh. 12. This suggestion was not followed.

On March 11, 1975, Mr. Moore sent a memorandum relating to the plaintiff's file to Mr. Thurmond. He stated:

> Attached is a copy of all pertinent information on a request for a transsexual operation on the above individual.

> This material was sent to the Foundation as we discussed several weeks ago, but as you can see, they were of no help in this situation.

> My recommendation is to deny Medicaid coverage for this type of operation as it remains experimental in nature and the Medical Schools in Georgia do not perform this type procedure and Dean Richardson at Emory Medical School also stated that they do not contemplate in the immediate future of having anyone with the expertise to carry out this procedure.

> I asked that Dr. Gillespie review the letter from Dr. Atkins at the Foundation and comment. He suggested Dr. Skelton, Director, Division of Mental Health review the case but in view of the fact that the Psychiatric Panel of the Foundation reviewed it, I feel we need to take a stand now and resolve it.

> I feel we will get repercussions regardless of the decision but expending money for this type procedure I feel could really be the worst move we could make at this point in time.

Plaintiff's Exh. 13. Mr. Moore testified[18] that his recommendation to deny coverage

---

**17.** The Foundation provides consulting services and medical expertise to the public and private sector.

**18.** Mr. Moore was unable to appear at the trial of this case due to medical problems. His

deposition testimony given on March 20, 1981, was offered in lieu of his live testimony under Fed.R.Evid. 804(b)(1).

pertained to this type of operation. He explained that he believed the Department would suffer repercussions if funding for transsexual surgery was denied because the "groups who were interested in this type of surgery would bring pressure" on the Department.[19] And, if funding was provided, Mr. Moore believed that the program would be subject to a federal audit by the Department of Health, Education and Welfare.

On March 26, 1975, upon considering Dr. Alfred's letter, the Foundation's letter, Mr. Moore's memorandum, and the plaintiff's Medicaid file, Mr. Thurmond denied the plaintiff's application for payment of the cost of transsexual surgery.[20] At trial, Mr. Thurmond testified that during his tenure he had overruled other decisions made by Mr. Villines. Mr. Thurmond testified further that he denied the plaintiff's application for several reasons. First, Mr. Thurmond stated that he "did not get an express unanimity from the experts that [he] had to rely on, namely Georgia physicians, that that procedure was done in Georgia." Trial Transcript, Vol. I at 35. Second, Mr. Thurmond noted, "There was not unanimity on the procedure in terms of viability." Id. Third, Mr. Thurmond placed great weight on the quotation contained in Dr. Alfred's letter. Mr. Thurmond stated that he inferred from that quotation that transsexual surgery was experimental.[21] Id. Fourth, Mr. Thurmond relied on Dr. Alfred's observation that Rush displayed some ambivalence concerning the surgery. This ambivalence and the absence of any medical pathological disorder requiring surgery convinced Mr. Thurmond that Rush was not a suitable candidate for transsexual surgery. Id. at 36, 37. Finally, Mr. Thurmond testified that he also relied in part on Mr. Moore's conclusion that transsexual surgery is ex-perimental in nature. Mr. Thurmond expressly denied that the denial was due to personal prejudice on his part toward transsexuals.

After Mr. Thurmond denied Rush's application, she requested that the Department reconsider its decision. Rush supplemented her application with several articles[22] and medical reports.[23] In August 1976, Mr. Thurmond again denied Rush's application, stating:

This denial is based on a careful review of the request and previous correspondence to determine the necessity of treatment based on any present pathological condition. Such determination indicated that no apparent pathological condition exists and since the Georgia Medicaid Program specifically eliminates payment for such procedures, in accordance with the physician policy manual, authorization is denied.

Plaintiff's Exh. 24.

The Department's disposition of the plaintiff's request for payment of the cost of transsexual surgery was made at a time when Mr. Thurmond had undertaken an overall revision of Medicaid policies in general. In the summer of 1974, Mr. Thurmond visited and investigated the programs developed by the states of Ohio and Kentucky in an effort to learn from their experiences. In late 1974, Mr. Thurmond assigned to a state employee, Mr. Tom Smith, the responsibility of developing general policy guidelines for the operation of the Medicaid program. Mr. Thurmond believed that these guidelines would aid in promoting arms-length transactions between the providers of medical services and the State.

---

19. Deposition of J. Moore at 65.

20. Trial Transcript, Vol. I at 65.

21. Mr. Thurmond defined experimental surgery as surgery not yet determined to be effective.

22. These articles included: Block & Tressler, Transsexualism and Surgical Procedures, *Medical Aspects of Human Sexuality* (February 1973); Benjamin & Ihenfeld, The Nature and Treatment of Transsexualism, 6 *Medical Opinion and Review* No. 11 (1970).

23. These medical reports included two letters from Dr. Lee Shelton, a letter from Mrs. Marcia E. Cotton, psychiatric social worker, Grady Memorial Hospital, Atlanta, Georgia, a letter from Dr. Robert W. Laidlaw, and a letter from Dr. Roberto C. Granato.

Thurmond testified that, prior to March 26, 1975, interim drafts of new program guidelines were in circulation. For instance, a draft of the guidelines governing prior approval and governing the scope of services was in circulation. That draft provided:

105. *Prior Approval*

The Department reserves the right to require prior approval for certain procedures. A detailed list of procedures requiring prior approval is contained in Chapter II. Prior approvals are authorized by the Director, Office of Medicaid.

106. *Scope of Services—General*

The Medical Assistance Program provides reimbursement for certain physician services whether furnished in the office, patient's home, hospital, skilled nursing facility or an intermediate care facility, subject to the limitations identified in Chapter II.

Chapter II discuss [*sic*] major procedural steps, including exclusions for reimbursement, prior approvals, and limitations for services.

This chapter is being developed with the 15 Specaalty [*sic*] Panels of the Medical Care Foundation. Chapter II will not be completed until May 17, 1975.

Defendant's Exh. I. Thurmond further testified that while, prior to March 26, 1975, he had not seen an interim draft of Chapter II, he had given consideration to a new guideline covering experimental surgery in general and transsexual surgery in particular. Moreover, he stated that although he could offer no tangible proof of an interim draft evidencing the ongoing process of experimental surgery policy developments, such a process was well underway prior to March 26, 1975. Trial Transcript, Vol. I at 102–104. Mr. Thurmond's efforts to develop general policy guidelines resulted in the rat-

ification of formal policies by the governing authority in late 1975.

Mr. Fred Felt, a former employee of the Department, testified that during Mr. Villines' tenure as Medicaid Director, the Department did not have a policy prohibiting payment for the cost of experimental surgery. Neither Dr. Gillespie nor Ms. Harbin recalled the existence of any policy prohibiting payment for experimental surgery or transsexual surgery prior to March 26, 1975.

While no previous claims relating to transsexual surgery had been filed by a Medicaid recipient, the Department had received requests for payment for the cost of ileocecal bypass surgery. This surgery is used to reduce weight in individuals suffering from obesity. The testimony was disputed as to whether these requests were made prior or subsequent to plaintiff's request. Mr. Thurmond testified that Medicaid had received for approval requests for ileocecal bypass surgery prior to or during the time when Rush's application was pending. Trial Transcript, Vol. I at 74. Whereas, Ms. Harbin testified that Medicaid decisions concerning ileocecal bypass surgery were made after March 26, 1975. *Id.* at 136.

B. *Whether the State's Determination that Transsexual Surgery is Experimental is Reasonable.*

Transsexualism is a recognized psychosexual disorder whose essential feature is an incongruence between anatomic and gender identity.[24] A transsexual experiences a persistent sense of discomfort and inappropriateness about his anatomic sex and a persistent wish to be rid of his genitals and to live as a member of the other sex. Plaintiff's Exh. F, American Psychological Association, Diagnostic and Statistical Manual of Mental Disorders (hereinafter "DSM"), 261 (3d ed. 1980).[25] A diagnosis of

---

24. According to one authoritative source, gender identity is defined as "the sense of knowing to which sex one belongs, that is, the awareness that 'I am a male,' or 'I am a female.' Gender identity is the private experience of gender role, and gender role is the public expression of gender identity." Plaintiff's Exhibit

F, American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 261 (3d ed. 1980).

25. The DSM is the standard manual for diagnosis used by psychiatrists. *See Millard v. Harris,* 406 F.2d 964, 981 n. 10 (D.C.Cir.1968); *Bell*

transsexualism is made only if the disturbance has been continuous for at least two years, is not due to another mental disorder, and is not associated with physical intersex [26] or genetic abnormality. *Id.* at 262. Generally a transsexual suffers from moderate to severe co-existing personality disturbances and frequently from considerable anxiety and depression, which the individual may attribute to his inability to live in the role of the desired sex. *Id.* Without treatment, the course of transsexualism "is 'chronic and unremitting.'" *Id.* With respect to the efficacy of transsexual surgery, the DSM provides: "Since surgical sex reassignment is a recent development, the long-term course of the disorder with this treatment is unknown." *Id.*

The terms "transsexual" and "transsexualism" are comparatively new. They were first coined in European medical literature in the early and mid-twentieth century and became known in the United States after the publication of *The Transsexual Phenomenon* by Dr. Harry Benjamin in 1964. The disorder was not included in the official publication of the American Psychiatric Association, the DSM, until 1980. However, medical researchers have documented the existence of the disorder dating to antiquity.[27]

If transsexualism [28] is diagnosed, sex-reassignment surgery is available as a method of treatment. Male-to-female surgery consists of castration and vaginal construction. A variety of methods have been used, involving single-stage and multi-stage procedures. Post-operative results of surgery vary with the skill of the treating physicians and the healing ability of the transsexual. Post-surgical patients live their lives in their new gender role.

In support of her contention that the State's determination that transsexual surgery is experimental is unreasonable, the plaintiff offered the testimony of two experts, Dr. Paul Walker and Dr. Sharon Satterfield. Dr. Walker is a clinical psychologist primarily in private practice in San Francisco, California, who specializes in gender identity disorders. Dr. Satterfield is a psychiatrist and is employed as an Assistant Professor of Family Practice and Child Psychiatry at the University of Minnesota, Minneapolis, Minnesota.

Dr. Walker's experience in the field of transsexualism is extensive. He has treated approximately twelve hundred transsexuals and has served in an academic capacity at several prestigious learning institutions. *See* Plaintiff's Exh. E. He informed the court about the history, etiology, and treatment methods of transsexualism. Dr. Walker testified that the etiology of transsexualism is not yet known. He noted that while there is general agreement among researchers that biology and the environment play a part in causing transsexualism no consensus exists as to which component plays a greater role. Dr. Walker testified that various methods are used to treat transsexuals. He stated that over the years psychotherapists have attempted to use psychotherapy both to cure and to palliate a transsexual's condition. According to Dr. Walker, a psychotherapeutic cure would consist of a change in the patient's gender identity to conform to his anatomic sex. Successful palliative psychotherapy relieves or lessens the psychological symptoms of the disorder, *e.g.*, depression and anxiety, and would assist the patient in adjusting to his condition. Dr. Walker believes that psychotherapy is not an effective form of treatment for transsexualism and that the

---

v. *Wayne County General Hospital,* 384 F.Supp. 1085, 1095 n. 10 (E.D.Mich.1974); *Doe v. Alleyne,* No. 216430, slip op., at 6 (Super.Ct. Conn. June 29, 1981).

**26.** Physical intersex involves physical pathology of the genitals. Trial Transcript, Vol. III at 48–49.

**27.** Trial Transcript, Vol. III at 74.

**28.** Transsexualism is generally viewed as distinguishable from transvestism. Transsexuals and transvestites engage in cross-dressing (dressing in clothes of the other sex). However, the individual with transvestism considers himself to be basically male, whereas the anatomically male transsexual has a female sexual identity. DSM at 269.

professional medical community concurs in his belief.

According to Dr. Walker, approximately six thousand individuals have had sex-reassignment surgery in this country. Sex-reassignment surgery was first performed in the United States in 1965. Dr. Walker stated that the surgery has generally been accepted by the informed medical community[29] as the treatment of choice in carefully selected patients and as a safe and effective treatment for properly screened and diagnosed transsexuals. His experience has led him to conclude that surgery has several positive results: it provides a feeling of psychological relief, improves social functioning, decreases anxiety, and lessens the pervasive unhappiness and depression that is attributable to transsexualism. Dr. Walker noted, however, that there are complications attendant to the operation and that one reliable study has found a high number of complications to occur in transsexual surgery. He was unsure whether the sample used in this study represented 90% or 12% of the pool of surgical patients. He further testified that a second study conducted by Drs. Laub and Fish reported a 47% complication rate. In criticizing this study, Dr. Walker observed that the researchers defined the term "complication" broadly and that therefore their finding was not surprising.

Dr. Satterfield's experience in the field of transsexualism has also been extensive. She has treated over two hundred fifty transsexuals and has conducted empirical research on transsexualism. In 1980, Dr. Satterfield conducted a study of twenty-five transsexuals who had had surgery.[30] Her research revealed a strong positive correlation between the quality of the surgical result and the transsexual's post-operative social and psychological well-being, a positive correlation between the degree of pre-operative gender dysphoria present and the overall post-operative improvement, and a positive correlation between intelligence quotient and vocational adjustment. She found no evidence of negative results from the surgery.

Dr. Satterfield testified that the results of her study differed greatly from the results of a study conducted by Drs. John Meyer and D.J. Reter. They followed fifty individuals, some of whom had had surgery. Their research revealed that applicants for sex reassignment, whether they undergo surgery or not, demonstrate improvement in functioning over time. They concluded that surgery confers no objective advantage in terms of social rehabilitation, although it remains subjectively satisfying for those who have undergone it. Dr. Satterfield did not consider this study to be reliable. While she conceded that her study and the Meyer and Reter study have increased the polarity of the views in the field of transsexualism, she concluded that there is overwhelming scientific evidence that the results of surgery are beneficial. According to Dr. Satterfield, if the results are measured in terms of the patient's satisfaction with the surgery, surgery is effective.[31]

Dr. Satterfield noted that psychotherapy has been used to treat transsexualism. She routinely attempts this form of treatment before she refers patients for surgery. In her opinion it has not been uniformly curative and has sometimes been palliative. She stated that she believed surgery to be safe and effective. She stated that given the high risk of suicide without surgery, it is the treatment of choice. She also testified that transsexual surgery is accepted by

29. Dr. Walker described the informed medical community as those professionals who have had experience, knowledge, or training with transsexualism. Trial Transcript, Vol. III at 126.

30. In Dr. Satterfield's study, each subject received a physical examination, filled out a questionnaire, received a personal interview, and completed various psychometric tests.

31. In reaching this conclusion Dr. Satterfield recognized that the effectiveness of transsexual surgery can be measured subjectively and objectively. Her testimony indicates that subjective measurements of surgery establish its effectiveness.

a majority of the informed medical community.

In support of its contention that the State's determination that transsexual surgery is experimental is reasonable, the State offered the testimony of three experts, Dr. John Meyer, Dr. Vamik Volkan, and Dr. Sheldon Cohen. Dr. Meyer is a psychiatrist who serves as an Associate Professor of Psychiatry at Johns Hopkins University, Baltimore, Maryland. He formerly served as the Director of the Gender Identity Clinic at Johns Hopkins University. Dr. Volkan is a psychiatrist who serves as Professor of Psychiatry at the University of Virginia, Charlottesville, Virginia. Dr. Cohen is a psychiatrist who is engaged in private practice in Atlanta, Georgia.

Dr. Meyer, a leading expert in the field of transsexualism, testified that there is a difference of opinion in the medical community as to the etiology of transsexualism and as to the appropriate form of treatment for transsexualism. He noted that there are three main hypotheses of etiology: biological, conflictual identity, and conflict of defense psychosis. A professional who adopts the biological point of view considers "the transsexual a kind of psychological intersex on biological grounds," and therefore, transsexual surgery, which makes the body fit with the mind, is an acceptable mode of treatment. Deposition of J. Meyer at 25. On the other hand, a professional who adopts the psychogenic point of view that the disorder is borne out of psychic conflict believes the treatment of choice is psychotherapy. And a professional who holds the view that the disorder is a product of "more than conflictual identity formation," is inclined to support the use of surgery. *Id.* at 26.

According to Dr. Meyer, there is a great diversity of opinion in the professional community as to whether transsexual surgery is an effective and proven treatment for the condition of transsexualism. Dr. Meyer testified that in his earlier writings he had

stated: "It may be that the only alternative open to the adult patient is a surgical reversal of the external genitalia, in which case reassignment surgery is indicated." He further testified that he had since changed his view with respect to the effectiveness and appropriateness of sex-reassignment surgery and that the general medical community does not accept the surgery. Dr. Meyer now believes that the question whether the surgery is safe [32] in terms of the psychological status of the patient remains unanswerable. He believes firmly that surgery is not any more effective than the passage of time. This view is based on his clinical experience with transsexuals and on his empirical research on transsexuals.

Between 1971 and 1975, Dr. Meyer conducted a study on the long-term effects of transsexual surgery. He followed a group of pre-operative and post-operative transsexuals. He found that of those transsexuals who had undergone surgery and those who had not, both functionally improved to the same degree. He testified that this finding was generally in accord with the finding of Drs. Hunt and Hampson, who in a follow-up study of seventeen post-operative transsexuals, concluded that surgery produced no change in levels of pathology and modest gains in economic and social functioning.

Dr. Volkan's experience in the field of transsexualism includes familiarity with approximately one hundred transsexuals. For several years, he served as a psychiatrist on the staff of the Gender Identity Clinic of the University of Virginia. Dr. Volkan testified that there is a difference of opinion in the medical community as to the etiology of transsexualism. Dr. Volkan personally holds a psychogenic view, and believes that surgery cannot cure the disorder. In his opinion, the professional medical community remains undecided as to whether transsexual surgery is effective treatment for transsexualism.

---

**32.** Dr. Meyer stated that the surgery is essentially major surgery with various attendant risks and complications.

Dr. Sheldon expressed an opinion similar to that of Dr. Volkan. Dr. Sheldon is a practicing psychiatrist who has not had any clinical experience with transsexuals. He stated that upon reviewing the scientific and medical literature in the field of transsexualism, he reached the conclusion that there is no consensus in the medical community as to whether surgery is effective treatment for transsexualism.[33] Further, he noted that although the surgery is not associated with a high mortality rate, the number of surgical complications attendant to the operation is high.

## II. CONCLUSIONS OF LAW

### A. Plaintiff's Statutory Claim

The Medicaid program created by Title XIX is a cooperative endeavor in which the federal government provides financial assistance to participating states to aid them in furnishing health care. Title XIX states that "[a] State plan for medical assistance must ... include reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan which ... are consistent with the objectives of this [Title]." 42 U.S.C. § 1396a(a)(17). The Supreme Court has interpreted this language to confer broad discretion on the states to adopt standards for determining the extent of medical assistance, requiring only that such standards be reasonable and consistent with the objectives of the statute. *Beal v. Doe*, 432 U.S. 438, 444, 97 S.Ct. 2366, 2370–71, 53 L.Ed.2d 464 (1977). It is a valid exercise of the State's discretion in determining the extent of medical assistance to define necessary services so as to exclude experimental treatment. *Rush v. Parham*, 625 F.2d at 1156. The considerations that go into determining whether a particular service is experimental are:

"whether the service has come to be generally accepted by the professional medical community as an effective and proven treatment for the condition for which it is being used...." On the other hand, if the service or treatment is not yet generally accepted, is rarely used, novel or relatively unknown, then authoritative evidence must be obtained that it is safe and effective before Medicaid may make payment.

*Id.* n. 11.

### 1. Whether the State Had a Policy

The court concludes for the reasons that follow that the State had an administratively evolving policy[34] generally[35] prohibiting

---

**33.** Defendant offered the testimony of Dr. Cohen to inform the court as to whether transsexual surgery is generally accepted in the medical community, *i.e.*, medical literature, as safe and effective treatment for transsexual surgery. Dr. Cohen is a psychiatrist who has been in private practice for twenty-three years. His testimony indicates that he undertook an objective survey of the medical literature and reached an opinion as to whether transsexual surgery is generally accepted in the medical community. In considering Dr. Cohen's testimony, the court notes that an expert may clearly base his opinion on sources of information of a type reasonably relied on by experts in forming an opinion on the subject in question. *See* Rule 703, Fed.R.Evid.; *Nanda v. Ford Motor Co.*, 509 F.2d 213, 222 (7th Cir.1974). The court finds that the effectiveness of transsexual surgery and the extent to which it has been accepted by the medical community are reflected in the current medical literature, as well as in the opinions of those professionals who have had extensive experience in the area of transsexualism.

**34.** The Fifth Circuit expressly directed this court to decide whether the State had an "administratively evolving policy" against payment for experimental services at the time it first rejected Rush's application. *Rush v. Parham*, 625 F.2d at 1157 n. 12. In doing so, the Fifth Circuit did not elaborate on the meaning of the term "administratively evolving policy." Although it appears to this court that an evolving policy would not serve the purpose of a policy, that is, to prescribe a guide to present and future decisions, the court is constrained by the appellate court's decision to apply the law of the case.

**35.** The Fifth Circuit's decision in *Rush* suggests that the State might have had an absolute or a qualified prohibition against payment for experimental services. *Rush v. Parham*, 625 F.2d at 1157 n. 14. The court finds that the State's evolving policy generally prohibited payment for experimental services. In light of Mr. Thurmond's testimony, it appears that the policy might admit of a single exception: where an individual suffered from a "medical pathologi-

payment for experimental services when it first rejected Rush's application on March 26, 1975.[36] First, the evidence demonstrates that Rush's application was denied at a time when Medicaid policies were undergoing major revision. When Mr. Thurmond became Director of the Department, the Medicaid program was subject to numerous audit exceptions. Mr. Thurmond assumed the responsibility of developing consistent policy guidelines for the operation of the program. While a written policy prohibiting payment was not drafted until May 1975, the Department shared its files with the Speciality Panels of the Georgia Medical Care Foundation, the professional organization responsible for drafting this policy. These files contained Rush's application and the Foundation's letter pertaining to her application. Second, there is no evidence that Mr. Thurmond's denial was based on any personal prejudice or revulsion toward transsexuals. Third, in directing the Medicaid program, Mr. Thurmond had reevaluated other decisions made by his predecessor, Mr. Villines, and had overruled several of Villines' decisions. Finally, and most importantly, in reconsidering Villines' approval of Rush's application, Mr. Thurmond sought the professional opinions of Dr. Alfred and the Foundation. In December 1974, Dr. Alfred quoted an authoritative medical source to Mr. Thurmond which led Mr. Thurmond to believe that there were no known cases where transsexuals had been cured by psychotherapy or any other form of treatment. In February 1975, the Foundation offered its opinion that "in some instances [transsexual surgery] has been of major assistance in improving the functioning capacity of individuals." Mr. Thurmond testified that he concluded, relying on these opinions and on Mr. Moore's recommendation concerning the experimental na-

ture of transsexual surgery, that this surgery was experimental and that Medicaid could not provide reimbursement for this type of service.

The court credits this testimony. There is sufficient evidence in the record to permit the court to infer that, prior to March 26, 1975, Mr. Thurmond was genuinely concerned about the abuses present in the Medicaid program. Further, prior to that date, Mr. Thurmond had given serious consideration to the scope of the coverage of the program and believed that the program should not fund experimental services.[37] When Rush's file was brought to his attention, he directed that additional information be gathered relative to the nature of the requested surgery and the prevalence of the surgery in Georgia. Upon review of this information, Mr. Thurmond reached the conclusion that the surgery was experimental. Thus, because the program did not fund experimental services, reimbursement was denied.

## 2. Whether the State's Determination that Transsexual Surgery Is Experimental Is Reasonable

The expert testimony presented by the parties is irreconcilably conflicting. The testimony demonstrates that the etiology of transsexualism is still debated by the medical community. Although Dr. Walker stated that etiology is not necessarily relevant to the question whether surgery is effective treatment for transsexualism, substantial evidence demonstrated a link between the various theories as to etiology and the recommended treatment. Moreover, while Drs. Walker and Satterfield testified that sex reassignment surgery is generally recognized by the informed medical community as an effective and proven treatment for the condition of transsexualism, Drs. Meyer,

---

cal condition" the State might permit reimbursement for an experimental service. *See* Trial Transcript, Vol. I at 47; Defendant's Exh. N.

**36.** In light of the court's finding that the State had an administratively evolving policy prohibiting reimbursement for transsexual surgery in March 1975, the court need not resolve the

question whether the State's adoption of an express policy could be applied retroactively to the plaintiff's request. *Rush v. Parham,* 625 F.2d at 1157 n. 12. The court notes, however, that the State itself chose to make its policy retroactive only until August 1975.

**37.** Trial Transcript, Vol. I at 20, 35, 101–05.

Volkan, and Cohen testified that it was not so recognized.[38] Substantial evidence presents a picture of growing concern in the medical literature over the long-term effectiveness of sex-reassignment surgery as a generally accepted form of treatment. Furthermore, although Drs. Walker and Satterfield testified that the surgery is safe and effective, the evidence taken as a whole shows that it constitutes major surgery with various attendant risks and complications and that there is no consensus in the professional medical community that the surgery is effective treatment for transsexualism. Finally, the DSM, an authoritative text which is an expression of the consensus of the professional psychiatric community as of 1980, states that the long-term course of the treatment of transsexualism with surgical reassignment is unknown. This statement supports the conclusion that the long-term effects of the procedure have yet to be determined.

In light of this evidence, the court finds that the State could reasonably determine that transsexual surgery is experimental. The evidence demonstrates that it is neither generally accepted as a proven and effective treatment nor is there authoritative evidence that the surgery is safe and effective.

### B. Plaintiff's Constitutional Claim

The Constitution imposes no obligation on the states to pay any of the medical expenses of indigents. *Maher v. Roe,* 432 U.S. 464, 470, 97 S.Ct. 2376, 2380, 53 L.Ed.2d 484 (1977). When a state decides to alleviate some of the hardships of poverty by providing medical care, the manner in which it dispenses benefits is subject to constitutional limitations. Plaintiff's claim is that the State's policy prohibiting reimbursement for transsexual surgery violates the equal protection clause of the fourteenth amend-

ment "by invidiously discriminating between transsexuals who require inpatient hospital services and physicians' services for such condition, and others who require such services for other conditions." Complaint ¶ 25.

"The guarantee of equal protection under the fourteenth amendment is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classifications and other governmental activity." *Harris v. McRae,* 448 U.S. 297, 323, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980). The basic framework of analysis of such a claim is well-settled:

> "We must decide, first, whether [state legislation] operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny.... If not, the [legislative] scheme must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination...."

*Maher v. Roe,* 432 U.S. at 471, 97 S.Ct. at 2381 (quoting *San Antonio School District v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973)). Applying this analysis to the present case, the court finds that the State's policy did not violate the equal protection clause of the fourteenth amendment.

This case involves no discrimination against a suspect classification. "Examining the traditional indicia of suspect classification, [the court] finds that transsexuals are not necessarily a 'discrete and insular minority,' nor has it been established that transsexuality is an 'immutable characteristic determined solely by accident of birth' like race or national origin." *Holloway v. Arthur Andersen & Co.,* 566 F.2d 659, 663, (9th Cir.1977) (quoting *Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848,

---

**38.** Plaintiff claims that the term "experimental" is bestowed upon "those treatments whose outcome is so uncertain that their efficacy lies more or less in the realm of speculation." Plaintiff's Proposed Finding of Fact No. 35(c). In the plaintiff's view, a procedure is experimental when it must first be approved by the human experimentation committee of the hospital where it is proposed to be used. In light of the Fifth Circuit's guidance in *Rush v. Parham* on the meaning of the term "experimental", 625 F.2d at 1156 n. 11, the court rejects the plaintiff's contention.

1852, 29 L.Ed.2d 534 (1971); *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973)). *Accord Doe v. Alexander*, 510 F.Supp. 900, 904 (D.Minn.1981); *Kirkpatrick v. Seligman & Latz, Inc.*, 475 F.Supp. 145, 147 (M.D.Fla.1979), *aff'd*, 636 F.2d 1047 (5th Cir.1981).

Under the rational basis standard, the State's prohibition against reimbursement for experimental surgery, including transsexual surgery, is rationally related to a legitimate governmental interest. The State has a legitimate governmental interest in protecting the public health. The court has found reasonable the State's determination that transsexual surgery is not generally accepted by the professional medical community as a proven and effective treatment for the condition for which it is being used and that there is no authoritative evidence that the surgery is safe and effective. Thus, the State's determination that medically necessary services do not include experimental surgery "with all its attendant risks to the recipient population," *Rush v. Parham*, 625 F.2d at 1156, withstands judicial scrutiny.

Accordingly, the Clerk of Court is hereby ORDERED to enter judgment for the defendant against the claims of plaintiff.

IT IS SO ORDERED.