DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**Q.H. c/o A.H.,**
Appellant,

v.

**SUNSHINE STATE HEALTH PLAN, INC.,**
Appellee.

No. 4D20-741

[October 7, 2020]

**CORRECTED OPINION**

Appeal from the State of Florida, Agency for Health Care Administration, L.T. Case No. AHCA 20-FH0016.

Morgan L. Weinstein of Weinstein Law, P.A., Fort Lauderdale, for appellant.

Craig H. Smith and Paige S. Comparato of Hogan Lovells US LLP, Miami, for appellee.

Nicholas A. Merlin, Senior Attorney, Tallahassee, for amicus curiae Agency for Health Care Administration.

GROSS, J.

Q.H., a 12-year-old girl, timely appeals a final administrative order of the Agency for Health Care Administration ("AHCA") upholding the denial of Medicaid coverage for a growth hormone treatment, Norditropin Flexpro, prescribed by her physician. We reverse because under the applicable statutory framework, the Agency took too restrictive a view of what constituted a necessary treatment for the child.

### *Background*

The child, who turned 12 years old in July 2020, is an enrolled member of appellee Sunshine State Health Plan, Inc.'s Medicaid plan. In August 2019, Dr. Colette Meehan, a board-certified pediatric endocrinologist, first evaluated the child for her "short stature." Over the three years preceding

this initial visit, the child's height dropped from the 45th percentile to the 25th percentile. Dr. Meehan diagnosed the child with growth hormone deficiency and prescribed the growth hormone Norditropin to treat the condition.

In October 2019, Dr. Meehan submitted a Prior Authorization Request to Sunshine Health for approval of the Norditropin medication. Evolved Pharmacy Solutions, the pharmacy benefit manager for Sunshine Health, denied the request on the ground that it was not medically necessary because the child's bone age was not "a minimum of one year behind chronological age." In denying the request, Evolved applied the AHCA's authorization criteria for growth hormone treatment in children.

The AHCA's criteria require that the child have an approved diagnosis with supporting documentation, that the child be 16 years old or younger, and that the treatment be prescribed by an endocrinologist, a pediatric endocrinologist, or a pediatric nephrologist. Additionally, with respect to the specific diagnosis of pediatric growth hormone deficiency, the AHCA's treatment criteria are as follows:

> **Growth velocity**: ≥ 2 standard deviations (SD) below the mean for age and gender (or at less than the 10th percentile)
> **Present height**: Less than the 5th percentile for age and sex, or the mid-parental height
> **Bone age**: Minimum of one year behind chronological age
> **Epiphyses**: Confirmation of open growth plates
> **Diagnostic Evaluation**:
> • **Two** subnormal responses to GH provocation tests (e.g., arginine, clonidine, glucagon, insulin and levodopa): Confirmation of stimulation test(s) with peak serum GH concentration less than 10 ng/ml; or . . . [listing other criteria]

Sunshine Health issued a corresponding Notice of Adverse Benefit Determination to the child, stating that the drug was not medically necessary because she did not meet the coverage guideline that her "bone age must be at a minimum of one year behind chronological age."

The child's mother requested an expedited plan appeal. Sunshine Health denied the plan appeal as follows:

> Your child does not have a height that is less than 95% of children her age. Your child does not, on the x-ray of her wrist show that her bones are growing at a rate (speed) that is behind her actual (real) age by at least one year. The blood

2

tests sent in with this plan appeal did not have enough information, to support the criteria for needing treatment with this drug at this time.

The denial of the plan appeal further stated that "[t]his decision was made with regards to EPSDT," referring to the Early and Periodic Screening, Diagnostic, and Treatment benefit under Medicaid.

### *Prehearing Administrative Proceedings*

The child requested a Medicaid Fair Hearing regarding the denial of coverage. The AHCA issued a scheduling order, which set the hearing for late January 2020.

In compliance with the scheduling order, the child submitted a statement of the case and a memorandum of law to support her position on medical necessity. The child argued, among other things, that Sunshine Health's adverse benefit determination violated the EPSDT.

### *Peer Review*

In preparation for the Fair Hearing, Sunshine Health sent the child's prior authorization request for an "independent external review," which was conducted by a board-certified pediatric endocrinologist. The peer review report concluded that the child "did not meet current policy standards/criteria for growth hormone administration." The report explained: "Member's present height is below mid-parental height, growth plates are open and she had 2 subnormal responses to GH provocative tests. However, there is no clear demonstration of poor growth velocity and bone age was not at least one year behind chronological age."

### *Fair Hearing*

The matter proceeded to a Fair Hearing. During opening statements, the child's counsel elaborated on some of the arguments raised in her memorandum of law. The child's counsel first contended that prescriptions were mandated as a minimum benefit under section 409.973(1), Florida Statutes, and that the only limit on the use of Norditropin under the Medicaid summary of drug limitations is that it cannot be received after the age of 16. The child's counsel further stated that Sunshine Health's denial of the treatment violated the EPSDT for the following reasons: (1) the EPSDT allows limits to be placed on a prescription, but a denial is not a limit; (2) the EPSDT required Sunshine

3

Health to consider "the particular needs of a child"; and (3) "prior authorization cannot delay a child's treatment."

A. *The mother's testimony*

The child's mother testified that the child had "just stopped growing" about three years ago. The mother explained that the child had "stayed basically the same height for three years, give or take a couple of centimeters." The mother noted that the child's shoe size and clothing size had not changed since the age of nine. The child's pediatrician referred the child to Dr. Meehan.

B. *Dr. Meehan's testimony*

Dr. Meehan, the child's pediatric endocrinologist, testified that she diagnosed the child with "short stature" at the child's initial visit in August 2009. Dr. Meehan testified that based upon the mother's height of 5′5″ and the deceased father's reported height of 6′0″, the child's estimated target mid-parental height was 5′6″, plus or minus two inches. Dr. Meehan acknowledged that the child's "bone age was not delayed," but explained that the child's predicted height was between 60.7 to 61.8 inches, which was "about five to six inches less than her genetic potential."

Dr. Meehan testified that the child underwent growth hormone stimulation testing, which "confirmed growth hormone deficiency." During the stimulation testing, the child "only peaked to a growth hormone level of 3.2." Prescription of a growth hormone "is indicated when the growth hormone peak is less than 10." According to Dr. Meehan, delayed bone age is not required to confirm a diagnosis of growth hormone deficiency: "No, it is suggestive, but it is not required for the diagnosis, and that is also part of the guidelines that we all follow as endocrinologists." She elaborated: "[I]t is not required for the bone age to be delayed to make the diagnosis. Because children should not be judged on one thing. It is looking at the entire picture . . . ."

Dr. Meehan prescribed Norditropin since it was preferred by the child's Medicaid plan. Because the child had a 3.2 growth hormone level, Dr. Meehan testified, there was "no question that she needs this medication." This treatment was within the standard of care. She acknowledged that any growth hormone could be prescribed to the child, but emphasized that "there is no other alternative to growth hormone" and that the child "requires growth hormone to treat growth hormone deficiency." Time is of the essence because the treatment needs to be given before the child goes through puberty and her growth plates fuse.

Dr. Meehan testified that she did not base her treatment recommendation on the AHCA guidelines, but rather relied upon the guidelines that were endorsed by the Pediatric Endocrine Society in 2015. She reiterated that the guidelines she followed were the "substantive standard of care for pediatric endocrinology patients."

When asked whether the child's growth velocity was greater than two standard deviations below the mean for her age and gender, Dr. Meehan testified: "Well, her growth velocity would have stopped. If she fell from the 45th to the 25th percentile, it is just a child who has maintained their current height and not gained anything. There was minimal growth[]."

Dr. Meehan admitted that: (1) the child was not less than the 5th percentile in terms of height, as she was at the 20th percentile the last time she was charted; and (2) the child's bone age was not a minimum of one year behind the chronological age. Dr. Meehan further conceded that the child did not meet all of the AHCA guidelines, elaborating: "In this policy statement that an endocrinologist did not write, yes."

Ultimately, Dr. Meehan suggested that following the AHCA's insurance guidelines would have violated the standard of care:

> Q. So would you consider if you followed, let's say different insurance guidelines that were not within the standard of care, would that violate the standard of care?
>
> A. Yes, and my Hippocratic Oath.

C. *Sunshine Health's pharmacist's testimony*

Dr. Whitney Moore-Smith, a clinical pharmacist at Sunshine Health, described the process leading up to the decision to deny Norditropin, including the pharmacy benefit manager's initial denial of the prior authorization request "due to the unmet bone age requirement" and Sunshine Health's decision to uphold the denial in each review of the request. Dr. Moore-Smith also noted that "an external review was performed by a Board-certified pediatric endocrinologist who also determined to uphold denial for unmet criteria of medical necessity."

During each review, the AHCA's prior authorization criteria were used to determine medical necessity. Dr. Moore-Smith testified that the AHCA's criteria were based upon a list of 15 credible references, including guidelines from the American Association of Clinical Endocrinologists and

5

several other evidence-based sources. Dr. Moore-Smith explained that there were several bodies that create clinical guidelines, that the AHCA policy used different clinical guidelines than Dr. Meehan, and that "we have to abide by the criteria created by AHCA at the State Medicaid Managed program."

Dr. Moore-Smith testified that medical necessity "requires a confirmed diagnosis and clinical needs." Further, she testified that the EPSDT was used in each review of the child's request. This means that "a decision is based on medical necessity and is not based on state or Plan preference." She stated that "[t]he basis of the denial for the initial prior authorization and the appeal are based on a confirmation of clinical diagnosis alone." She elaborated that the EPSDT takes factors such as cost-effectiveness "out of consideration" and relies exclusively on whether the medication is "medically necessary for the patient based on their diagnosis." But, she explained, the patients "do have to have that confirmed diagnosis in order to do that." She admitted, however, that she had never treated or examined the child.

Finally, Dr. Moore-Smith testified that the child received "individualized" consideration under the EPSDT because "[e]ach criteria point for this specific patient was referenced."

D. *Medical Director's testimony*

Dr. Wiggan, a medical director of Sunshine Health and the pediatrician who conducted the review of the child's plan appeal, testified that the child did not meet the AHCA's guidelines in the following ways: (1) the child's bone age was not delayed, which was a "very big" factor; (2) the child's growth velocity had not been calculated; and (3) the child's present height was not less than the 5th percentile for age, and for the mid-parental height alternative, there was no confirmed height for the father—only an estimated height.[1] Dr. Wiggan also testified that an independent external review was done by a pediatric endocrinologist, who also concluded that the child did not meet the AHCA criteria for the medication.

---

[1] However, Dr. Wiggan later conceded that the child satisfied the mid-parental height factor: "The mid-parental height was there, but because she also failed two other criteria, I cannot use that alone and that is why there is more than one criteria." Dr. Wiggan appeared to criticize the mid-parental height factor *itself* as not being an objective measure: "And although the mid-parental height, *she is less than the mid-parental height*, her target potential height just as her endocrinologist has stated, is an estimate. It's not an objective measure."

Dr. Wiggan testified that the guidelines that Dr. Meehan relied upon are not the guidelines that are used by the AHCA. Dr. Wiggan confirmed that the AHCA used 15 references to create the medical necessity criteria. She stated that the determination of whether Norditropin was medically necessary for the child was based exclusively on the AHCA guidelines and that "[t]here was nothing else to be considered."

Dr. Wiggan admitted that she did not examine or treat the child herself, emphasizing that Sunshine Health makes its decisions "based on the clinical documentation that is submitted." Dr. Wiggan also admitted that delayed bone age was not necessary to confirm a diagnosis of growth hormone deficiency, but explained that it was important as one of the policy criteria to decide on treatment:

> The diagnosis of growth hormone deficiency . . . is based on, one, yes, she does have growth hormone deficiency by her blood investigation. The degree of her growth hormone deficiency as based on the policy criteria for us to decide on treatment, bone age is very important as one of those criteria.

Dr. Wiggan also testified that the AHCA's medical necessity guidelines complied with the EPSDT:

> Q. . . . [M]y next question is regarding the EPSDT, you stated that this complies, the medically necessary guideline complies with the EPSDT. Can you explain that?
>
> A. Of course. EPSDT is based on medical necessity. . . . In this case, EPSDT was referenced. She was not found (inaudible) based on the clinical documentation submitted, based on the policy guidelines by AHCA to meet medical necessity, and as such, EPSDT was considered.

Dr. Wiggan testified that the child was denied the treatment because the child did not meet the criteria for medical necessity under the AHCA policy. Dr. Wiggan acknowledged that there was a denial of treatment, rather than a limit on service or treatment. However, she reiterated that EPSDT was considered, explaining that EPSDT was still based on medical necessity. She explained: "I did not feel in my clinical judgment and based on the guidelines . . . of the policy that [the child] meets the criteria of medical necessity to get Norditropin."

## Final Order

In the final order, the hearing officer framed the issue as whether the child "proved by a preponderance of the evidence that [Sunshine Health's] decision to deny [her] request for Norditropin Flexpro was incorrect." The hearing officer noted that States must provide EPSDT services to Medicaid-eligible children under age 21, and that the child was eligible for EPSDT services. Quoting 42 U.S.C. § 1396d(r)(5), the hearing officer noted that EPSDT services meant "[s]uch other necessary health care, diagnostic services, treatment, and other measures . . . to correct or ameliorate defects and physical and mental illnesses and conditions . . . ." The hearing officer stated, however, that "a state may place medical necessity limitations on EPSDT services," citing 42 C.F.R. §§ 440.230(a), (b), (d). The hearing officer also stated that section 409.905(2), Florida Statutes, limits EPSDT services with a medical necessity standard.

Turning to the instant case, the hearing officer concluded that the child had not met AHCA's prior authorization criteria for hormone treatment because the child did not have a bone age of less than her actual age and was not in the 5th percentile for her height.[2] Furthermore, citing the definition of medical necessity incorporated in Florida Administrative Code Rule 59G-1.010, the hearing officer found that the child had not shown that the treatment was medically necessary because "all criteria of medical necessity" had not been met. This appeal ensued.

## Standard of Review

In an appeal from final administrative action, this court reviews the agency's findings of fact for whether they are supported by competent substantial evidence, while this court reviews the agency's conclusions of law de novo. *Dorcely v. State Dep't of Bus. & Prof'l Regulation*, 22 So. 3d 834, 836 (Fla. 4th DCA 2009). "In interpreting a state statute or rule, a state court . . . may not defer to an administrative agency's interpretation of such statute or rule, and must instead interpret such statute or rule de novo." Art. V, § 21, Fla. Const.

---

[2] We note that a careful reading of AHCA's guidelines shows that the present height requirement can be met *either* if the child's present height is less than the 5th percentile for age and sex, *or* if the child's present height is less than the mid-parental height. Here, the child presented unrebutted evidence that her present height was less than the mid-parental height, a fact Dr. Wiggan ultimately conceded.

8

***Legal Background on Medicaid and EPSDT***

Medicaid is a cooperative federal-state program designed to assist states with the cost of providing health care to needy individuals. 42 U.S.C. § 1396 et seq. Benefits are "administered through state agencies pursuant to a Medicaid program that has been submitted to and approved by the U.S. Department of Health and Human Services." *Pharm. Research & Mfrs. of Am. v. Meadows*, 304 F.3d 1197, 1199–1200 (11th Cir. 2002). "A state's participation in the Medicaid program is voluntary, but once a state opts to participate it must comply with federal statutory and regulatory requirements." *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011).

A state plan for medical assistance must "include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which . . . are consistent with the objectives" of the Medicaid Act. 42 U.S.C. § 1396a(a)(17)(A). "This language confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be 'reasonable' and 'consistent with the objectives' of the Act." *Beal v. Doe*, 432 U.S. 438, 444 (1977). Thus, "[w]hile states must meet the substantive requirements of the federal Medicaid Act, they nonetheless retain discretion to design and administer their Medicaid programs." *Moore*, 637 F.3d at 1238.

Some categories of services are mandatory for a participating state to include in its Medicaid plan, while others are discretionary, including a prescription drug benefit. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(12). The State of Florida has elected to require all Medicaid managed care plans to cover prescription drugs. § 409.973(1)(w), Fla. Stat. (2020).

In 1989, Congress amended the Medicaid Act to mandate that participating states provide "early and periodic screening, diagnostic, and treatment" ("EPSDT") services to all Medicaid-eligible persons under the age of 21. *Moore*, 637 F.3d at 1233. "The purpose of EPSDT is to ensure that underserved children receive preventive health care and follow-up treatment." *John B. v. Menke*, 176 F. Supp. 2d 786, 790 (M.D. Tenn. 2001).

The catch-all EPSDT provision in the Medicaid Act requires participating states to provide Medicaid-eligible children with "[s]uch other *necessary* health care, diagnostic services, treatment, and other measures described in subsection (a) *to correct or ameliorate* defects and physical and mental illnesses and conditions discovered by the screening services, *whether or not such services are covered under the State plan*." 42 U.S.C.

42 U.S.C. § 1396d(r)(5) (emphasis added). Thus, "a state Medicaid agency must provide, under the EPSDT program, (1) any medical assistance that a state is permitted to cover under § 1396d(a) of the Medicaid Act, that is (2) necessary to correct or ameliorate defects and physical and mental illnesses and conditions discovered by screening." *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 593 (5th Cir. 2004); *accord Smith v. Benson*, 703 F. Supp. 2d 1262, 1269 (S.D. Fla. 2010).

The Medicaid Act does not define the terms "necessary" or "medically necessary." *See* 42 U.S.C. § 1396d (listing definitions). However, "[a]lthough the standard of 'medical necessity' is not explicitly denoted in the Medicaid Act, it has become a judicially accepted component of the federal legislative scheme." *Moore*, 637 F.3d at 1232. The EPSDT amendment did not change the "medical necessity" limitation. *Id.* at 1234.

Under federal Medicaid regulations, "[e]ach service must be sufficient in amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R. § 440.230(b). However, a state "may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." 42 C.F.R. § 440.230(d). The Centers for Medicare and Medicaid Services ("CMS"), a federal agency, has instructed participating states that "[a]ppropriate limits may be placed on EPSDT services based on medical necessity," and that "[y]ou make the determination as to whether the service is necessary." CMS Medicaid Manual §§ 5110, 5122.F.

Likewise, cases interpreting federal Medicaid law have held that "a state may adopt a definition of medical necessity that places reasonable limits on a physician's discretion." *Rush v. Parham*, 625 F.2d 1150, 1154 (5th Cir. 1980). In other words, "a state may establish standards for individual physicians to use in determining what services are appropriate in a particular case." *Id.* at 1156. "A state may also limit required Medicaid services based upon its judgment of degree of medical necessity so long as such limitations do not discriminate on the basis of the kind of medical condition." *Moore*, 637 F.3d at 1255.

The treating physician has "the primary responsibility of determining what treatment should be made available to his patients." *Rush*, 625 F.2d at 1156. "[A] state Medicaid agency can review the medical necessity of treatment prescribed by a doctor on a case-by-case basis." *Id.* at 1155. Accordingly, "[b]oth the treating physician and the state have roles to play," and the treating "physician's word on medical necessity is not dispositive." *Moore*, 637 F.3d at 1255 (internal quotation mark omitted); *but see Pinneke v. Preisser*, 623 F.2d 546, 550 (8th Cir. 1980) ("The decision of whether or not certain treatment or a particular type of surgery

is 'medically necessary' rests with the individual recipient's physician and not with clerical personnel or government officials.").

In short, "the Medicaid Act does not give the treating physician unilateral discretion to define medical necessity so long as the physician does not violate the law or breach ethical duties *any more than it gives such discretion to the state so long as the state does not refuse to provide a required service outright.*" *Moore*, 637 F.3d at 1259–60 (emphasis added).

Under the Florida statute governing mandatory Medicaid services, the AHCA is authorized to determine which EPSDT services are "medically necessary":

> (2) EARLY AND PERIODIC SCREENING, DIAGNOSIS, AND TREATMENT SERVICES.—The agency shall pay for early and periodic screening and diagnosis of a recipient under age 21 to ascertain physical and mental problems and conditions and ***all services determined by the agency to be medically necessary for the treatment, correction, or amelioration of these problems and conditions***, including personal care, private duty nursing, durable medical equipment, physical therapy, occupational therapy, speech therapy, respiratory therapy, and immunizations.

§ 409.905(2), Fla. Stat. (2020) (emphasis added).

The AHCA has defined "medically necessary" or "medical necessity" for purposes of Medicaid coverage as follows:

> **2.83 Medically Necessary or Medical Necessity**
> The medical or allied care, goods, or services furnished or ordered must meet the following conditions:
>
> • Be necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain
> • Be individualized, specific, and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the patient's needs
> • Be consistent with generally accepted professional medical standards as determined by the Medicaid program, and not experimental or investigational
> • Be reflective of the level of service that can be safely furnished, and for which no equally effective and more conservative or less costly treatment is available statewide

11

> • Be furnished in a manner not primarily intended for the convenience of the recipient, the recipient's caretaker, or the provider
>
> The fact that a provider has prescribed, recommended, or approved medical or allied care, goods, or services does not, in itself, make such care, goods or services medically necessary or a medical necessity or a covered service. . . .

Fla. Admin. Code R. 59G-1.010(2) (2020) (incorporating by reference the Florida Medicaid Definitions Policy, August 2017, available on the AHCA's website at http://ahca.myflorida.com/Medicaid/review/index.shtml).

Significantly, Florida courts have held that the AHCA's definition of "medical necessity" is "overly restrictive" in the context of a claim for EPSDT services. *See C.F. v. Dep't of Children & Families*, 934 So. 2d 1 (Fla. 3d DCA 2005). In *C.F.*, the Third District held that a hearing officer "erred when he applied definitions of medical necessity and personal care assistance that are overly restrictive and violate federal Medicaid law." *Id.* at 5. There, the hearing officer relied upon the definition of "medical necessity" in Rule 59G–1.010 to uphold the Department's decision to reduce the personal care assistance hours for a nine-year-old Medicaid recipient who suffered from brain damage. *Id.* at 2–5. On appeal, the Third District reversed and remanded for the Department to provide the child with the number of personal care assistance hours prescribed by his physician:

> The language used in the Final Order shows that the hearing officer improperly applied a more restrictive definition of "medical necessity" than that outlined by federal Medicaid law. The Department used the same definition of medical necessity that it uses for both adults and children and failed to incorporate the EPSDT requirements.
>
> . . .
>
> The state definition of medical necessity is a narrower view that does not encompass the assistance a caretaker would need in taking care of a disabled child. The federal definition, on the other hand, encompasses a more expansive view, allowing for services that sustain or support, as opposed to actually treating the disability.
>
> . . .

We conclude that the Department incorrectly used more restrictive definitions of "medical necessity" and "personal care assistance" than federal law requires. The hearing officer also failed to give the proper weight to the opinion and recommendation of C.F.'s treating physician.

*Id.* at 5–7.

Similarly, in *E.B. v. Agency for Health Care Administration*, 94 So. 3d 708, 708–09 (Fla. 4th DCA 2012), this court cited *C.F.* with approval and reversed an administrative order disallowing some of a Medicaid-eligible child's requested hours of home service, where the hearing officer failed to consider the EPSDT standard in making the determination "as to which services requested by [the child] were covered by the Medicaid HHA Program."

Under federal law, "states *can* implement prior authorization requirements and other utilization review mechanisms before approving covered items to children under 21." *Smith*, 703 F. Supp. 2d at 1277. For example, in Florida, the AHCA has the statutory authority to require prior authorization for Medicaid-covered prescribed drugs. *See, e.g.,* § 409.912(5)(a)14., Fla. Stat. (2020) ("The agency may require prior authorization for Medicaid-covered prescribed drugs.").

Under the EPSDT, however, "[t]he assessment of medical need for treatment of a given condition . . . cannot be limited to a predefined list of criteria."[3] *Jacobus v. Dep't of PATH*, 857 A.2d 785, 792 (Vt. 2004). "While States may use prior authorization and other utilization controls to ensure that treatment services are medically necessary, these controls must be consistent with the preventive thrust of the EPSDT benefit." H.R. Rep. No. 101-247, at 399 (1989). Accordingly, Medicaid recipients under the EPSDT program "are entitled to individualized review of their specific conditions." *Jacobus*, 857 A.2d at 792. "Simply reapplying the listed criteria is not an individualized review." *Id.* at 789.

Similarly, the CMS has instructed states that the determination of medical necessity for an individual child covered under EPSDT must be made on a case-by-case basis, taking into account the particular needs of the child:

---

[3] Although the Vermont Supreme Court's ruling was based in part on the court's interpretation of Vermont's own regulations, the ruling was also based on the court's interpretation of the EPSDT.

> Services that fit within the scope of coverage under EPSDT must be provided to a child only if necessary to correct or ameliorate the individual child's physical or mental condition, i.e., only if "medically necessary." The determination of whether a service is medically necessary for an individual child ***must be made on a case-by-case basis, taking into account the particular needs of the child***. . . . States are permitted (but not required) to set parameters that apply to the determination of medical necessity in individual cases, ***but those parameters may not contradict or be more restrictive than the federal statutory requirement***.

Centers for Medicare & Medicaid Services, U.S. Dep't of Health & Human Services., *EPSDT – A Guide for States: Coverage in the Medicaid Benefit for Children and Adolescents* (June 2014).

Finally, under the Florida Medicaid Authorization Requirements Policy, if services cannot be approved at the first review level, a peer review physician is not limited to prior authorization criteria in determining medical necessity:

> The QIO may use a national standardized set of criteria, or other set of criteria, approved by AHCA, as a guide for authorizations performed at the first review level. If services cannot be approved at the first level review, the QIO's ***physician peer reviewer will determine medical necessity using his or her clinical judgment, acceptable standards of care, state and federal laws, and AHCA's medical necessity definition***.

Fla. Admin. Code R. 59G-1.053(2) (incorporating by reference the Florida Medicaid Authorization Requirements Policy, available on the AHCA's website at http://ahca.myflorida.com/Medicaid/review/index.shtml) (emphasis added).

### The Final Order and the AHCA's Prior Authorization Criteria Violated the EPSDT as Applied to this Case

Many of the child's arguments on appeal boil down to a single issue—whether the final order and the AHCA's prior authorization criteria violated the EPSDT under the facts of this case?

14

In determining the meaning of the EPSDT, the starting point is the plain language of the statute. The EPSDT requires states to provide Medicaid-eligible children with "[s]uch other *necessary* health care, diagnostic services, treatment, and other measures . . . *to correct or ameliorate defects and physical and mental illnesses and conditions* discovered by the screening services . . . ." 42 U.S.C. 42 U.S.C. § 1396d(r)(5) (emphasis added). While a state may adopt standards for determining medical necessity, such standards must be reasonable and congruous with the purpose of the EPSDT. *See Moore,* 637 F.3d at 1244, 1255. Under the EPSDT, the state's assessment of medical need for a child's treatment "cannot be limited to a predefined list of criteria." *Jacobus,* 857 A.2d at 792.

Here, the child's failure to satisfy each of the prior authorization criteria should not have been dispositive. While a state may adopt prior authorization criteria, those criteria cannot be applied in a way that is incongruous with the EPSDT. Indeed, Florida's Medicaid regulations recognize this. Under Rule 59G-1.053(2), the prior authorization criteria are designed to serve "as a guide for authorizations performed at the first review level." But, if a service cannot be approved at the first review level, a peer review physician is not limited to the prior authorization criteria, but instead "will determine medical necessity using his or her clinical judgment, acceptable standards of care, state and *federal laws*, and AHCA's medical necessity definition." *Id.* (emphasis added).

Notably, the EPSDT contemplates individualized review of a child's condition. "Individualized" means "to adapt to the needs or special circumstances of an individual."[4] As explained in the EPSDT Guide, the determination of medical necessity for an individual child covered under EPSDT must be made on a case-by-case basis, taking into account the particular needs of the child.

At each stage of review in this case, the child was denied the treatment based upon the prior authorization criteria. However, simply reapplying the prior authorization criteria was not an individualized determination of the child's needs. Medical diagnosis is both an art and a science. For a given child, one authorization criterion could outweigh the others in the determination of necessity. The physicians at Sunshine Health incorrectly viewed the EPSDT as something that is "invoked" only if a child meets all the prior authorization criteria for treatment.

---

[4] *Individualized,* Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/individualized (last visited Oct. 5, 2020).

While a treating physician's opinion of medical necessity is not dispositive, the state also does not have unilateral discretion to define medical necessity under the EPSDT. *Moore* instructs that both the treating physician and the state have a role to play. Furthermore, *C.F.* teaches that "[a] state agency must give considerable and substantial weight to the opinions of treating physicians." 934 So. 2d at 7. Here, the treating physician—the only witness at the hearing who was a pediatric endocrinologist—testified that following the AHCA's prior authorization criteria would have violated the standard of care. But the treating physician's opinion of medical necessity was disregarded entirely, with her opinion being rejected in favor of the prior authorization criteria and the definition of medical necessity set forth in the Florida Administrative Code.

At the Fair Hearing in this case, the child proved that the prior authorization criteria were unreasonable as applied to her. More to the point, the child proved that the treatment was necessary to "correct or ameliorate" her physical condition.

In this case, the treating physician's testimony established that the child had a defect or physical condition—namely, short stature caused by growth hormone deficiency. Moreover, there was evidence that the child had essentially stopped growing for the preceding three years. Although the child did not meet the bone age requirement of the AHCA criteria, Dr. Meehan testified that delayed bone age is not required to confirm a diagnosis of growth hormone deficiency. Notably, Sunshine Health's testifying pediatrician *did not dispute the diagnosis itself*, which was confirmed based on the child's blood tests: "[Y]es, she does have growth hormone deficiency by her blood investigation."

The child's treating physician also testified that the child unquestionably needed the medication because, without growth hormone treatment, the child would fail to reach her estimated mid-parental height by about five or six inches. Sunshine Health's witnesses did not rebut this testimony.

Importantly, the hearing officer found that "credible evidence established that [the child] would not meet her estimated mid-parental height." Still, the hearing officer found that the treatment was not medically necessary because there was no evidence that Norditropin was necessary "to protect life, to prevent significant illness or significant disability, or to alleviate pain." However, the hearing officer applied the wrong standard. Under the reasoning of *C.F.* and *E.B.*, the hearing officer erred in applying the "overly restrictive" definition of medical necessity set forth in the Florida Administrative Code, rather than the more expansive

EPSDT standard of whether the treatment was necessary to "correct or ameliorate" the child's condition. Here, under the plain language of the EPSDT, the child established that the treatment was necessary to "correct or ameliorate" her physical condition. This is all the EPSDT statute requires.

The dissent invokes a "hyperbolic metaphor" from Justice Scalia and likens our decision to a proverbial "wolf" that violates principles of separation of powers and federalism. This is, to borrow another phrase from Justice Scalia, "pure applesauce."[5] As the Eleventh Circuit has explained, "[w]hile Congress could have conferred the 'final arbiter' role to the state, it did not." *Moore*, 637 F.3d at 1259. "When a state Medicaid agency has exceeded the bounds of its authority by adopting an unreasonable definition of medical necessity or by failing to ensure that a required service is 'sufficient in amount, duration, and scope to reasonably achieve its purpose,' aggrieved Medicaid recipients have recourse in the courts." *Id.* (quoting 42 C.F.R. § 440.230(c), (d)).

Indeed, it is the dissent's approach that would fail to uphold Congress's intent in the administration of the EPSDT program, thereby implicating principles of separation of powers and federalism. The purpose of the EPSDT is to prevent the onset or worsening of medical conditions in Medicaid-eligible children before it is too late. By treating the prior authorization criteria as conclusive on the question of medical necessity, the dissent undermines Congress's intent for the EPSDT to be an expansive and comprehensive program.

While we agree with *Moore* that a state may adopt a reasonable definition of medical necessity, any such definition must be consistent with the EPSDT's "necessary to correct or ameliorate" standard. *See Collins v. Hamilton*, 349 F.3d 371, 376 n.8 (7th Cir. 2003) ("[A] state's discretion to exclude services deemed 'medically necessary' by an EPSDT provider has been circumscribed by the express mandate of the statute."). And Florida courts have held that the AHCA's definition of medical necessity applicable to adult Medicaid recipients is narrower than the EPSDT standard. *See C.F.*, 934 So. 2d at 6; *E.B.*, 94 So. 3d at 708–09. The dissent's approach provides less coverage than the EPSDT statute requires.

For these reasons, we reverse and remand for further proceedings consistent with this opinion.

---

[5] *See King v. Burwell*, 576 U.S. 473, 507 (2015) (Scalia, J., dissenting).

CIKLIN, J., concurs.

ARTAU, J., dissents with an opinion.

ARTAU, J., dissenting.

> Frequently an issue of this sort will come before the Court clad, so to speak, in sheep's clothing: the potential of the asserted principle to effect important change in the equilibrium of power is not immediately evident, and must be discerned by a careful and perceptive analysis. But this wolf comes as a wolf.

*Morrison v. Olson,* 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

Of course, this is not just an ordinary metaphor. It is hyperbole. Perhaps one might call it a hyperbolic metaphor. But it makes the point that even when a well-intentioned request comes "clad" in "sheep's clothing," it is still a proverbial "wolf" if the result is an unconstitutional change to the balance of our separate constitutional powers.[6]

I dissent because the Agency for Health Care Administration's (AHCA's) prior authorization criteria for growth hormone treatment are reasonable utilization controls that are consistent with federal statutes and regulations. By establishing and implementing its own criteria, the AHCA has not categorically or impermissibly denied prescription drug coverage or growth hormone treatment. Rather, Q.H. (the child) is ineligible for this type of treatment because her growth delay has not become severe enough to meet the criteria.

The Florida Legislature expressly designated the AHCA as the single state agency authorized to administer and provide stewardship over taxpayer dollars used to cover Medicaid program expenses. *See generally* §§ 409.902, 409.908, and 409.963, Fla. Stat. (2019). In addition, the Legislature charged the AHCA with oversight responsibility over the Florida Medicaid program and designated it as "the final arbiter of medical necessity." *See* § 409.913(1)(d), Fla. Stat. (2019). As long as the limitations on Medicaid services, including Early and Periodic Screening,

---

[6] The use of the *Morrison v. Olson* "wolf" reference is not intended to be taken literally, nor does it attribute anything awry or improper about the legal arguments or opinions of the majority, or that of any of the parties to this action. Instead, it is being used as a hyperbolic metaphor in the manner employed by the late Justice Scalia to emphasize the significance of protecting our constitutional form of government.

Diagnosis, and Treatment (EPSDT) services, are lawfully and reasonably applied, it is not the role of this court to instruct the AHCA how it should better apply the criteria to determine medical necessity. To do so would result in an unconstitutional encroachment by the judicial branch on the executive branch of government. *See Dep't of Children & Family Servs. v. I.C.*, 742 So. 2d 401, 404 (Fla. 4th DCA 1999) ("The court cannot 'micro manage' a facility operated by DCF. Nor can the court order DCF to provide specific treatment or placement of a child." (citations omitted)).

In *I.C.*, we reversed the trial court on separation of powers grounds when it precluded the executive branch, through the Department of Children and Families (DCF), from placing disabled children in a particular facility. *Id.* at 405. In doing so, we concluded: "All of these are executive agency decisions which implicate policy development and prioritizing of funding. *These matters are not assigned to the judiciary to resolve.*" *Id.* at 404 (emphasis added). Likewise, the creation and implementation of authorization criteria are executive branch decisions which implicate policy development and funding priorities. These matters are not assigned to the judiciary to resolve.

Here, the AHCA criteria do not violate the Medicaid program's mandate to provide EPSDT services to the covered children. The authorization criteria simply serve as a screening device for the AHCA to determine whether a child's growth delay or condition qualifies based on medical necessity for growth hormone treatment. And as the Medicaid insurer's clinical pharmacist testified, the criteria are based upon a list of fifteen credible references, including guidelines from the American Association of Clinical Endocrinologists and several other evidence-based sources.

The Medicaid insurer's pediatrician testified that the child did not meet the criteria because (1) her bone age was not delayed more than one year behind her chronological age, (2) her growth velocity had not been calculated, and (3) her height was not less than the fifth percentile for her age and sex. Moreover, a board-certified pediatric endocrinologist performed an external review and concluded that the child did not meet the AHCA's criteria for the treatment. Indeed, the child's treating physician agreed that the child does not have a bone age of less than her actual age and that the child is not less than the fifth percentile for her age and sex. Instead, the treating physician testified that the child's growth rate well exceeded that percentile, and that she is "not a minimum of one year behind the chronological age rate." Simply put, the child's doctor conceded that his patient does not meet the criteria for Medicaid coverage of growth hormone treatment as "medically necessary" at this time, but rather advocated for the AHCA to adopt or accept her own

19

guidelines, which she believed to be the preferred recommended care for the child. Notably, if the child's condition changes (i.e., a manifested bone age delay and she becomes sufficiently behind the chronological age rate to qualify), she can request Medicaid coverage of the growth hormone treatment at that time.

Medicaid is a cooperative federal-state program. Within broad federal guidelines, each state may place certain limitations on coverage pursuant to uniformly applied eligibility criteria. *See Moore Ex Rel. Moore v. Resse,* 637 F.3d 1220, 1232–33 (11th Cir. 2011) ("Accordingly, even if a category of medical services or treatments is mandatory under the Medicaid Act, participating states must provide those medical services or treatments for Medicaid recipients only if they are 'medically necessary.'").

While the majority relies upon *Moore* as one of the seminal cases on this subject, the Eleventh Circuit acknowledged there that: "(1) a treating physician is not the sole arbiter of medical necessity; (2) the state may review the medical necessity of a treating physician's prescribed treatment; [and] (3) the state may adopt a reasonable definition of medical necessity, even if it places some limits on a treating physician's discretion . . . ." *Id.* at 1248 (citing to *Rush v. Parham,* 625 F.2d 1150, 1154–55 (5th Cir. 1980)). Clearly, federalism principles provide for participating states to play an important role in defining medical necessity.

The majority relies on a Vermont case, *Jacobus v. Dep't of PATH,* 857 A.2d 785 (Vt. 2004), in concluding that the AHCA failed to conduct an individualized review here. Their reliance, however, is misplaced because *Jacobus* turned on Vermont's own regulations which incorporated a catch-all provision requiring the Medicaid provider to cover orthodontic treatment if it was determined, upon an individualized review, that treatment was "otherwise necessary." *Id.* at 792. The Vermont Supreme Court ruled that the assessment of medical need for treatment cannot be limited to a predefined list of criteria because the catch-all provision there mandated an individualized review of whether the treatment sought was "otherwise necessary" as required by "its own regulations" for the orthodontic services sought. *Id.* Florida's regulations do not incorporate an "otherwise necessary" catch-all provision which would require an individualized review for growth hormone treatment outside of the listed criteria. Unlike the majority, I do not agree that the AHCA failed to conduct an individualized review of the child's case by basing its decision on the authorization criteria.

The majority's reliance on *C.F. v. Dep't of Children & Families,* 934 So. 2d 1 (Fla. 3d DCA 2005), is also misplaced. *C.F.* was a challenge to the

state agency's action in reducing the duration of medical services that were determined to be medically necessary under the state agency's established criteria. *Id.* at 2–3. Thus, *C.F.* was governed by subsection (b) of the applicable federal regulation. *See* 42 C.F.R. § 440.230(b) (subsection (b) provides that "[e]ach service must be sufficient in amount, *duration*, and scope to reasonably achieve its purpose." (emphasis added)). The issue in *C.F.* was whether the state agency had met its burden of proof to reduce the *duration* or number of hours that had previously been approved as medically necessary for personal care services to a brain-damaged nine-year-old boy. *C.F.*, 934 So. 2d at 2–3. Unlike here, personal care services were undisputedly covered as medically necessary for the young boy pursuant to the Medicaid program's EPSDT services. *Id.* at 5–6. *C.F.* held that reduction of the *duration* of personal care hours that had previously been determined to be medically necessary for the young boy was not supported by competent substantial evidence. *Id.* at 7. Accordingly, *C.F.* held that "[t]he hearing officer's interpretation directly conflicts with federal Medicaid law authorizing [personal care services] when prescribed by a physician in accordance with a treatment plan." *Id.* at 6.

Likewise, the majority's reliance on *E.B. v. Agency for Health Care Admin.*, 94 So. 3d 708 (Fla. 4th DCA 2012), is misplaced. In remanding for a determination of whether the twelve-year-old autistic girl in *E.B.* was appropriately limited in *duration* to four hours per day of home health aide services—rather than the requested twelve hours—we relied upon *C.F.* in determining the challenge there to the *duration* of the services that had been determined to be medically necessary under the state agency's established criteria. *Id.* at 708–09 (citing *C.F.*, 934 So. 2d at 6). Here, we are not addressing a subsection (b) challenge to the *duration* of medically necessary services.

Notably, the seminal Eleventh Circuit case relied upon by the majority, *Moore*, found the "EPSDT-required service at issue in *C.F.*" to be "inapposite" to its holding that a state has "authority to 'place appropriate limits on a service based on such criteria as medical necessity,' 42 C.F.R. § 440.230(d), or to 'include reasonable standards . . . for determining . . . the extent of medical assistance' . . . ." 637 F.3d at 1261 & n.66. *Moore* further distinguished *C.F.* because "the EPSDT-required service at issue in *C.F.*—'personal care services'—contained a statutory qualifier that does not similarly apply to [other services]." *Id.* (citing 42 U.S.C. § 1396d(a)(24)) (states are required to furnish the "'personal care services' that are 'authorized for the individual by a physician in accordance with a plan of treatment'"). No such statutory qualifier is at issue here.

Moreover, the Eleventh Circuit in *Moore* rejected any notion that *C.F.*, or its progeny, *E.B.*, control here. *Moore*, 637 F.3d at 1261 & n.66. Instead, *Moore* upheld the authority of the states under principles of federalism to establish their own reasonable authorization criteria for medical necessity. *Id.* at 1259 ("A state is obligated to provide EPSDT-eligible children with private duty nursing services, *but only to the extent that they are medically necessary.*" (emphasis added)).

As noted above, this is not a subsection (b) case. Unlike *C.F.* and *E.B.*, the child here does not challenge a reduction in the *duration* of medically necessary services. Instead, the child challenges the state agency's established criteria or utilization control procedures for determining whether the requested service is medically necessary for her condition. Thus, subsection (d) is the dispositive federal regulation here. Recognizing a state's autonomous role in Medicaid's cooperative federal-state program, subsection (d) expressly provides that in our system of federalism: "The agency may place appropriate *limits* on a service *based on such criteria as medical necessity or on utilization control procedures.*" 42 C.F.R. § 440.230(d) (emphasis added).

Although the majority refers to the dissent's approach as "pure applesauce,"[7] it is the majority's approach that includes *Moore* in its bushel of cited apples, so to speak, despite its contrary interpretation of the controlling federal regulation here. The majority's approach disregards subsection (d) while stripping away the state agency's regulatory authority, upsetting the balance of power, and converting this federal-state program into something that was never contemplated by Congress or the states when they agreed to participate in the Medicaid program. As explained by the Eleventh Circuit in *Moore*: "While the 1989 Amendment took away participating states' discretion to provide certain EPSDT services, *it did not strip those states of their regulatory authority to 'place appropriate limits' on such required services 'based on such criteria as medical necessity.'*" 637 F.3d at 1259 (citing 42 C.F.R. § 440.230(d)) (emphasis added). The majority's approach rejects *Moore*'s interpretation and strips away what Congress left intact.

In *Beal v. Doe*, 432 U.S. 438 (1977), the U.S. Supreme Court upheld Pennsylvania's regulation which excluded nontherapeutic abortions from Medicaid coverage. *Id.* at 447. The Supreme Court explained that while "a State [is] free to provide such coverage if it so desires[,]" it is not required to do so. *Id.* In its interpretation of the statutory text, the Court held that "nothing in the [Medicaid] statute suggests that participating States are

---

[7] Quoting *King v. Burwell*, 576 U.S. 473, 507 (2015) (Scalia, J., dissenting).

required to fund every medical procedure that falls within the delineated categories of medical care." *Id.* at 444. In sum, *Beal* held that the statutory language expressly "confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be 'reasonable' and 'consistent with the objectives' of the Act." *Id.* at 444 (quoting Social Security Act § 1902, 42 U.S.C. § 1396a(a)(17) (Supp. V 1970)). The Supreme Court reasoned that "it is hardly inconsistent with the objectives of the Act for a State to refuse to fund unnecessary—though perhaps desirable—medical services." *Id.* at 444–45.

In *Rush*, where the patient sued Georgia and federal officials to secure funding for gender reassignment surgery, the old Fifth Circuit[8] concluded that since a state has discretion to establish standards under the Medicaid program and shape its own definition of medical necessity, "Georgia's definition of medically necessary services can reasonably exclude experimental treatment." 625 F.2d at 1156. There, the patient's treating physician had recommended surgical change of Rush's anatomical sex. *Id.* at 1152–53. However, the *Rush* court ultimately reversed the district court's decision which had ordered Georgia to pay for the surgery, upholding the "valid exercise of Georgia's discretion to set standards under the Medicaid statute." *Id.* at 1156–58.

And in *Lorenzo v. Agency for Health Care Admin.*, 985 So. 2d 703 (Fla. 4th DCA 2008), this court acknowledged the executive branch's rightful role to determine medical necessity when we affirmed the AHCA's decision denying Medicaid coverage of hyperbaric oxygen treatment. *Id.* at 703. As we correctly concluded in *Lorenzo*, it is "[t]he State of Florida through the Agency for Health Care Administration [that] determines whether such treatment is medically necessary" for the patient's condition. *Id.*

In sum, assessing medical necessity by applying standard authorization criteria is not incongruous with the requirement to provide EPSDT services, nor is it inconsistent with addressing this child's growth delay or medical condition as required by the Medicaid program. While the majority asserts that the hearing officer applied the wrong standard for medical necessity, the hearing officer cited the correct EPSDT standard from section 409.905(2), Florida Statutes (2019), and acknowledged that because the child is under the age of 21, "Florida Medicaid would cover the request if it were medically necessary." As reasoned in the seminal

---

[8] Prior to the establishment of the U.S. Court of Appeals for the Eleventh Circuit pursuant to the Fifth Circuit Court of Appeals Reorganization Act of 1980, Pub. L. No. 96-452, 94 Stat. 1994 (1980) (codified at 28 U.S.C. §§ 1, 41 (Supp. V 1981)).

case from the Eleventh Circuit, *Moore*, "[i]t is unclear how a state Medicaid agency could effectively discharge its § 440.230(d) authority if the treating physician were the only actor effectively placing a 'medical necessity' limitation on a required service." 637 F.3d at 1259 (citing 42 C.F.R. § 440.230(d)). Likewise, in determining that the AHCA's authorization criteria should be overridden by the treating physician's preferred recommended care, the majority has reweighed the evidence by adopting the physician's opinion as dispositive, stripping the AHCA of its lawful regulatory authority to place appropriate limits on growth hormone treatment.

Pursuant to 42 C.F.R. § 440.230(d), the AHCA has authority to adopt a definition of medical necessity that places appropriate limitations on covered services based on medical necessity criteria or other utilization control procedures. And because the Legislature has designated the AHCA as "the final arbiter of medical necessity" in section 409.913, our review should be limited to whether competent substantial evidence supports the AHCA's lawful and reasonable application of its authorization criteria. Undoubtedly, competent substantial evidence supports the AHCA's decision here.

As declared in what may be the most important opinion in American constitutional law, *Marbury v. Madison*: "It is emphatically the province and duty of the judicial department to say what the law is." 5 U.S. (1 Cranch) 137, 177 (1803). It is not, however, the province and duty of the judicial branch to tell the legislative branch what the law should be, nor to tell the executive branch how it should better execute or carry out the laws it administers. It is also not the province of this court to tell the AHCA how it should better execute or carry out the Medicaid program it is lawfully administering. Accordingly, I respectfully dissent.

*         *         *

***Not final until disposition of timely filed motion for rehearing.***